[Crim. No. 1533. Third Appellate District.—September 28, 1937.]

THE PEOPLE, Respondent, v. PAT CHAMBERS et al., Appellants.

694

Pat Chambers, Martin Wilson, Caroline Decker, Albert Hougardy and Nora Conklin, *in pro. per.*, and Leo Gallagher, R. W. Henderson and Grover C. Johnson for Appellants.

U. S. Webb, Attorney-General, and Lloyd G. Buchler and Wilmer W. Morse, Deputies Attorney-General, for Respondent.

THE COURT.—The appellants were jointly indicted and convicted of criminal syndicalism contrary to the statutes of California. (Stats. 1919, p. 281; 3 Deering's Gen. Laws of 1931, Act 8428, p. 4702.)

It is contended the act is unconstitutional; that the indictment fails to state a public offense; that the verdict and judgment are not supported by the evidence; that the verdict is inconsistent with another verdict rendered in this case by the same jury at the same time acquitting the appellants of the same charges under a second indictment; that the court erred in receiving and rejecting evidence and in giving and refusing to give certain instructions, and that the trial judge and the prosecuting officers were guilty of prejudicial misconduct which precluded the appellants from receiving a fair and impartial trial.

Seventeen defendants were jointly charged in two indictments with criminal syndicalism and a conspiracy to commit that offense. Both indictments were dismissed as to two of the accused persons. Demurrers were sustained to all except counts IV and VI of the first indictment. Demurrers were

overruled as to all other counts of both indictments. The two indictments were consolidated for trial at the request of the defendants. Upon trial all of the defendants were acquitted of the charges contained in the second indictment, numbered 12908. Seven of the defendants were also acquitted of the charges contained in the first indictment, numbered 12889. The remaining eight defendants were convicted of the charges contained in counts IV and VI of the first indictment. From that judgment and the order denying a new trial those eight defendants have appealed.

The fourth count of the first indictment, numbered 12889, charges the defendants with organizing, joining and managing seven named associations with the purpose of advocating, teaching, aiding and abetting criminal syndicalism as a means of accomplishing a change in the industrial ownership and control of property and to effect political changes.

Paragraph one of the sixth count of that indictment charges the defendants with conspiring to accomplish changes in the industrial ownership and control of property and of political institutions, by means of terrorism, force, violence, sabotage, and by teaching, advocating, aiding and abetting the destruction of property by means of force and violence. This paragraph also charges them, as a part of that conspiracy, with printing, publishing, circulating and distributing Communistic literature which advocated criminal syndicalism. The contents of these documents were not quoted, nor were the instruments identified by title or otherwise in that indictment.

Paragraph two of the sixth count of that indictment charges the defendants with a conspiracy to commit criminal syndicalism by organizing, joining and managing the associations mentioned in the fourth count of the same indictment.

The demurrers to counts IV and VI of indictment number 12889, under which counts the defendants were convicted, were properly overruled. Counts IV and VI of that indictment charge the defendants with the crimes of syndicalism and a conspiracy to commit syndicalism in the language of the statute, with sufficient particularity to conform to sections 950, 951, and 952 of the Penal Code. (*People* v. *Malley*, 49 Cal. App. 597 [194 Pac. 48]; *People* v. *Whitney*, 57 Cal. App. 449 [207 Pac. 698].) The demurrers assert that count IV of the first indictment fails to state a

public offense for the reason that it is not specifically alleged what the purposes of the organizations were. This count is not subject to that criticism. Criminal syndicalism is defined by the statute as:

"Any doctrine or precept advocating, teaching or aiding and abetting the commission of crime, sabotage (which word is hereby defined as meaning wilful and malicious physical damage or injury to physical property), or unlawful acts of force and violence or unlawful methods of terrorism as a means of accomplishing a change in industrial ownership or control, or effecting any political change."

Section 2, subdivision 4, of that act further provides that:

"Any person who . . . 4. Organizes or assists in organizing, or is or knowingly becomes a member of, any organization, society, group or assemblage of persons organized or assembled to advocate, teach or aid and abet criminal syndicalism . . . is guilty of a felony and punishable by imprisonment in the state prison."

Count IV of the indictment charges the defendants with "criminal syndicalism" committed on the —— day of June, 1934, in Sacramento County, California, in the following language:

"Said defendants did then and there wilfully, unlawfully and feloniously organize and assist in organizing, and they are and each of them is and each of them knowingly became a member of an organization, society, group and assemblage of persons known and designated as 'Sacramento Workers School', 'Patrick Henry Club', 'Young Communist League', 'Unemployed Counsel', 'Communist Party', 'Agricultural', 'The C. & A. W. I. U.' otherwise known and called 'The Cannery & Agricultural Workers Industrial Union', said . . . (organizations) are each and all identical in aims and purposes and have the same objectives and are controlled, dominated, and actively directed by the same persons and officers, towit: the above named defendants, . . . and all of said organizations, societies and groups were and each of them was organized and assembled to organize, teach, aid, and abet Criminal Syndicalism as a means of accomplishing a change in industrial ownership and control [of property] and effecting political changes."

The preceding language specifically charges the appellants with organizing and knowingly becoming members of the designated associations created by them to teach, aid and

abet criminal syndicalism as defined by the statute. This is a sufficient compliance with the statute and the demurrers to that count were properly overruled.

The demurrers to count VI of the first indictment were presented on the ground that it omits to specify the details of the plan by means of which the defendants are accused of conspiring to commit criminal syndicalism, and also that it fails to identify the pamphlets, books and documents advocating syndicalism, which they are charged with circulating.

This attack upon count VI of the indictment is also without merit. It is specifically alleged, as may be observed by reference to the portion of that count above quoted, that the means of accomplishing the prohibited changes in the industrial ownership and control of property and of political changes were the use of terrorism, force and violence, sabotage, strikes and boycotts, and by teaching, advocating, aiding and abetting those unlawful methods of accomplishing their alleged purpose, and by printing, circulating and distributing books, pamphlets and documents advocating crime, sabotage and malicious damage to property by force and violence. These allegations are definite and specific. They adequately conform to the requirements of the statute.

It is true that the books, documents and pamphlets advocating syndicalism, which they are charged with printing, circulating, and distributing, are not specifically identified in the indictment. It is unquestionably the better practice to identify in the indictment in some manner the documents relied upon as a necessary element of the criminal charge. But it appears there were thirty-two of them, consisting of hundreds of pages. They are extremely lengthy. No useful purpose would be subserved by quoting them in the indictment. The nature of these documents is alleged. Their contents were well known to each of the appellants. They appertain to the Communist plan of destroying the ordained form of government by force and violence, and to the confiscation of property without legal process or compensation. It has been held that it is unnecessary to enumerate specifically or incorporate documents in an indictment under such circumstances. (*People* v. *Malley, supra.*) Count VI of the indictment therefore sufficiently states a public offense, and the demurrers thereto were properly overruled.

The second indictment numbered 12908 charged the appellants with criminal syndicalism on the —— day of June, 1934, alleging the defendants did by the use of "*spoken and written words and personal conduct* advocate, teach, aid and abet" crime, sabotage, violence and unlawful means of procuring changes in industrial ownership and control of property and changes in political government. This indictment also charged them with criminal syndicalism by unlawfully publishing, distributing and circulating thirty-two separate books, pamphlets and documents which are identified and designated by reference to their printed titles and the subject-matter contained therein.

Since the appellants were acquitted by the jury of all of the charges contained in this second indictment, we shall later consider the inconsistent effect of those two verdicts.

■ The California Syndicalism Act is not unconstitutional. It does not violate the Fourteenth Amendment of the Constitution of the United States. (*Whitney* v. *California,* 274 U. S. 357 [47 Sup. Ct. 641, 71 L. Ed. 1095]; *People* v. *McClennegen,* 195 Cal. 445, 468 [234 Pac. 91].) The constitutionality of the California Syndicalism Act is approved in the late case of *Herndon* v. *Lowry,* 301 U. S. 242 [57 Sup. Ct. 732, 81 L. Ed. 623, 632].

The cases of *De Jonge* v. *Oregon,* 299 U. S. 353 [57 Sup. Ct. 255, 81 L. Ed. 278], and *Herndon* v. *Lowry, supra,* are not in conflict with the validity of the Criminal Syndicalism Act of California. In the De Jonge case there were no overt acts or conduct of the defendant to sustain the conviction of a violation of the Oregon Syndicalism Act. In that case the United States Supreme Court approved the validity of the California Syndicalism Act as it was applied in the Whitney case. All that the record shows De Jonge did was to attend a public meeting in Portland, held under the auspices of the Communist Party, ninety per cent of the audience being persons who were not Communists. The meeting was for the purpose of protesting against interference with a dock strike. He did not advocate force or violence against the state authorities. He was not charged with membership in the Communist Party, nor does it appear that the unlawful principles of the Communist Party were discussed or advocated at that meeting. The appellant in that case was merely charged with assisting in conducting a meet-

ing called under the auspices of the Communist Party. The meeting was public and orderly and it was held for the lawful purpose of protesting against dock strike conditions and hiring-hall raids. There were three hundred individuals present. Only ten per cent of them were Communists. Neither criminal syndicalism nor other unlawful conduct was advocated by the appellant in that case or by anyone else at that meeting. The court said:

"The words of the indictment that 'said assemblage of persons, organization, society and group did then and there unlawfully and feloniously *teach and advocate* the doctrine of criminal syndicalism and sabotage', referred not to the meeting in question, or to anything then and there said or done by defendant or others," but only to the conduct of the Communist Party.

The court further said:

"He [the defendant] was not indicted for participating in its [the Communist Party] organization, or for joining it, or for soliciting members or for distributing its literature. He was not charged with teaching or advocating criminal syndicalism or sabotage or any unlawful acts, either at the meeting or elsewhere.

" . . . His sole offense as charged, and for which he was convicted . . . was that he had assisted in the conduct of a public meeting, albeit otherwise lawful, which was held under the auspices of the Communist Party."

The court then concluded that:

"*While the states are entitled to protect themselves from the abuse of the privileges of our institutions through an attempted substitution of force and violence in the place of peaceful political action in order to effect revolutionary changes in government,* none of our decisions go to the length of sustaining such a curtailment of the right of free speech and assemblage," as shown in the De Jonge case.

As stated above, in the De Jonge case the court approved the constitutionality of the California Syndicalism Act as it was applied in the Whitney case. The judgment was reversed solely because of a lack of evidence to support the indictment.

In the Herndon case a Negro was indicted for insurrection contrary to section 56 of the Georgia Penal Code by

"calling and attending public assemblies and by making speeches for the purpose of organizing and establishing

groups and combinations of white and colored persons under the name of the Communist Party of Atlanta for the purpose of uniting, combining and conspiring to incite riots and to embarrass and impede the orderly processes of the courts and offering combined resistance to, and, by force and violence, overthrowing and defeating the authority of the state; that by speech and persuasion, the appellant solicited and attempted to solicit persons to join . . . and become members of the Communist Party, . . . and introduced into the State and circulated . . . booklets, papers and other writings with the same intent and purpose.''

When Herndon was arrested he had in his room and on his person certain Communist documents. The court said:

''There *was no evidence that he had distributed* any of the material carried on his person and found in his room, or had taken any of it to meetings. . . .

''The two circulars, admittedly distributed by the appellant, *had nothing to do with the Communist Party.*''

The documents found in his possession refer merely to a party which is ''the vanguard of the working class'', etc. None of them advocated insurrection or the use of force or violence to confiscate property or to overturn the American form of government. The court said:

''There is no evidence the appellant distributed any writings or printed matter found in the box he carried when arrested, or any other advocating forcible subversion of governmental authority. *There is no evidence the appellant advocated, by speech or written word, at meetings or elsewhere, any doctrine or action implying such forcible subversion.*''

It was there held it must appear the acts, conduct and utterances charged contemplate force or violence to upset the form of government. The court further stated that the intent to incite insurrection must furnish a *''clear and present danger''*, not immediately, but within a reasonable time, to obstruct the law and must be determined or inferred *''from the time, place and circumstances of the act''*. The court then said:

''The only prohibition [of a valid statute] he is said to have violated is that of section 56 forbidding incitement or attempted *incitement to insurrection by violence.* If the evidence fails to show that he did so incite, then, as applied to him, the statute unreasonably limits freedom of speech and freedom of assembly and violates the Fourteenth Amendment.

*We are of opinion that the requisite proof is lacking. . . . It is apparent that the documents found upon the appellant's person were certainly . . . innocent and consistent with peaceful action for a change in the laws or the Constitution.* The proof wholly fails to show that the appellant had read these documents; that he had distributed any of them; that he believed and advocated any or all of the principles and aims set forth in them, or that those he had procured to become members of the party knew or approved of any of these documents.

'' . . . In its application the offense made criminal is that of soliciting members for a political party and conducting meetings of a local unit of that party when one of the doctrines of the party, established by reference to a document *not shown to have been exhibited to anyone* by the accused, may be said to be ultimate resort to violence at some indefinite future time against organized government.''

It is held in the Herndon case that the evidence fails to show that he possessed literature which advocated violence; that he knew the contents of the documents which he possessed, or that he made known the contents of those documents to others. It was definitely held that the evidence failed to prove that the accused person had in his possession literature advocating violence, or that he held meetings *''for the purpose of inciting insurrection''*. The court said:

"The question is not whether Georgia might, *in analogy to what other states have done,* so declare."

In a dissenting opinion which was filed in the Herndon case, in which four justices concurred, it was said:

"That the constitutional guaranty of freedom of speech and assembly does not shield or afford protection for acts of intentional incitement to forcible resistance to the lawful authority of a state is settled by repeated decisions of this court."

In support of the preceding statement, the following authorities are cited: *Gitlow* v. *New York,* 268 U. S. 652, 666 [45 Sup. Ct. 625, 69 L. Ed. 1138, 1145]; *Whitney* v. *California,* 274 U. S. 357, 371 [47 Sup. Ct. 641, 71 L. Ed. 1095, 1104]; *Fiske* v. *Kansas,* 274 U. S. 380, 385 [47 Sup. Ct. 655, 71 L. Ed. 1108, 1111]; *Stromberg* v. *California,* 283 U. S. 359, 368 [51 Sup. Ct. 532, 75 L. Ed. 1117, 1122, 73 A. L. R. 1484]; *Near* v. *Minnesota,* 283 U. S. 697, 708 [51 Sup. Ct. 625, 75 L. Ed. 1357, 1363].

The Herndon case was reversed solely for lack of evidence to sustain the charge of insurrection. Both the statute and the proof in the present case differ vitally from the Herndon case.

█ It is insisted the judgment in this case should be reversed pursuant to the principle announced in the Herndon case, *supra*, that it does not appear from the evidence there is a "clear and present danger" of a change in industrial ownership or control of property or of the form of political government as a result of the alleged advocating and exercise of force and violence on the part of the appellants for that purpose. It is also asserted the appellants were prohibited from introducing evidence to prove that no such present danger existed. With respect to the insufficiency of the evidence the Herndon case holds that the intent to incite insurrection must furnish a "clear and present danger", not immediately, but within a reasonable time, to obstruct the law and that it must be determined or inferred "from the time, place and circumstances of the act".

It will be observed the Supreme Court does not hold there must be a present danger of the existence of *actual insurrection*. It is there said there must be evidence of a present danger of activity *to obstruct the law* with the intention of inciting insurrection. It was held in that case there was a total absence of proof of overt acts in violation of the insurrection law. No incendiary literature was possessed or circulated by the defendant. He was held not to have advocated the doctrine of Communism. The Georgia statute does not make mere membership in an organization which advocates force and violence a crime. In the present case there is evidence of a present danger of violating the law. The evidence tends to show that the appellants actually organized associations for the purpose of syndicalism; and that they taught and advocated the principles of Communism by distributing its literature and by otherwise aiding, abetting and encouraging others to resort to intimidation, force and violence to confiscate property and destroy ordained government. There is evidence that they did participate in strikes in which force and violence were used. █ The court may take judicial knowledge of the fact that the land is filled with labor disturbances, and that sit-down strikes and other forms of strikes have recently occurred in California and elsewhere, in which force, violence, unlawful practices

and deaths have occurred. There is substantial evidence of overt acts on the part of the appellants to violate the Syndicalism Act. These acts and conduct furnish evidence of a present danger. It was the province of the jury to determine from the evidence adduced whether there was a present danger of unlawful confiscation of property or political changes on account of the appellants' activity. With that province of the jury we may not interfere.

It is no defense to a charge of criminal syndicalism against those who actually organize associations for that purpose, and who teach, advocate, aid, encourage and abet the confiscation of property and the destruction of government by intimidation, force and violence, that they failed to actually incite revolution because they lacked sufficient votes or physical force to accomplish their purpose.

It would be unreasonable to hold that overt acts which were intended to accomplish syndicalism, or a conspiracy to commit syndicalism, do not constitute a violation of the statute merely because private property was not actually confiscated or the government destroyed. Certainly the law may presume from such overt acts as occurred in this case that the appellants intended to and actually did attempt to carry out their avowed policy of confiscating property and destroying the institutions of government by force and violence.

Established law justifies one in the use of necessary means of protecting himself or his property against unlawful force and violence, when he has reasonable cause to believe such force is about to be exercised. The state has a right to protect its citizens against threatened unlawful interference with their persons or property. It is said in the Gitlow case, *supra,* in that regard:

"It .[the State] cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruction; *but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency.*"

Our attention is not called to the rejecting of any material evidence tending to show that the conduct of the appellants did not furnish a present danger of their violation of the Syndicalism Act. The nature of the proffered evidence was not indicated. In the absence of such showing

we must assume that such excluded evidence, if any, was merely cumulative, and not prejudicial.

The appellants were not unduly restricted in their examination of prospective jurors on their *voir dire*. At least no prejudicial error on that account appears of record. Twenty assignments of error are relied upon. We find no substantial merit in these assignments. The impaneling of the jury consumed nearly a month. An unusually large number of jurors were examined very completely. The appellants appear to have been granted reasonable latitude in their cross-examination of these prospective jurors. They did exhaust all their peremptory challenges and additional challenges were granted to them. They did object to the trial of the cause by the jury which was finally sworn. Not one of the prospective jurors, the limitations of whose examinations were criticized, was sworn to try the cause. Each of these challenged jurors was excused either by agreement, for cause, or upon peremptory challenges. Some of them were excused by the prosecution. Our attention is not called to any evidence indicating that the appellants or any of them were compelled to or did exercise challenges for cause or peremptory challenges to any of these prospective jurors. Under such circumstances we are unable to hold as a matter of law that the appellants were prejudiced by the sustaining of objections to these propounded questions.

It has been said that while it is true that a reasonable latitude should be granted by the court in the examination of jurors on their *voir dire* with the object of ascertaining their state of mind with relation to the presence or absence of bias and prejudice, it is not only the privilege, but it is the duty of the court, to restrict the examination of prospective jurors within reasonable bounds so as to expedite the trial. (*People* v. *Semone*, 140 Cal. App. 318, 326 [35 Pac. (2d) 379].)

Many of these questions related to an asserted right to resort to force and violence to resist organized authority upon the remote and improbable contingency that the form of the American Government may some day become a dictatorship foisted upon the people against their will by a controlling minority capitalistic class. These questions involve an implied claim of right to organize private groups of in-

dividuals to advocate and participate in the unlawful use of force and violence to suppress what amounts to insurrection.

These questions are not based upon issues which are involved in this case or upon the application of any practical lawful theory thereof. We must assume that unlawful usurpation of governmental authority or control of property by unauthorized minority classes will be restored to the proper officers by operation of law and not by insurrections. The legal procedure for determining the right to a public office is by means of the writ of *quo warranto*. Both federal and state Constitutions prohibit the taking of private property without process of law, and then only upon payment of just compensation therefor. The documents of the Communists advocate confiscation of property without compensation and destruction of the government by force and violence. They assert the right of individuals and organizations to enforce by violence the will of the majority against a minority in power if the latter refuse to accede to the demands of the former. That is not lawful conduct. The doctrine of a democracy is that the majority shall control, but that the minority is still entitled to representation and to the protection of the law. The executive and legislative branches of both federal and state governments are the only authorities vested with the lawful power to quell insurrections. Private persons and organizations have no such vested right. Organizing an association to advocate the use of force and violence to confiscate property and to destroy the government is akin to insurrection, which is prohibited by the Syndicalism Act of California.

The appellants may not complain of being restricted in their examination of prospective jurors by the refusal to entertain questions based upon the assumption that the constitutional guaranty of freedom of speech entitles one to criticize publicly the form of government or its officers and to advocate a change of property rights and governmental principles by unlawful means. The theory of these questions was that under the doctrine of the freedom of speech the California Syndicalism Act is necessarily void. It is true that laws should not infringe upon our guaranteed freedom of speech and lawful assembly. Independence of thought and freedom of speech should be encouraged in the interest of ascertaining the truth. The truth will never suffer from honest speech.

But great harm may result from wilful, reckless or ignorant distortion of the facts. Unrestrained acts and utterances may result in the destruction of one's reputation or his property. The primary purpose of government is to protect persons, property and lawful privileges of its citizens. The spreading of false propaganda is the curse of the age. There is a clear distinction between freedom of speech and an unrestrained license to say recklessly or wilfully anything one pleases without regard to the truth. In the guise of freedom of speech one may not be permitted to whisper away the good reputation or character of another person, or destroy his business or property by false rumors. Such malicious conduct may be punished as libelous. Freedom of speech does not permit one to encourage, aid or abet the commission of a crime by another. Our statutes punish such individuals as principals in the transaction. Both federal and state laws prohibit individuals from conspiring to confiscate property or to destroy government. Both federal and state authorities may be used to suppress insurrection. Freedom of speech must be exercised with due regard to the personal and property rights of others. There can be no freedom of speech except such as exists pursuant to law. The chief issue in the propounding of these challenged questions and throughout the trial is whether government by threatened intimidation, force and violence shall prevail over ordained government under and pursuant to established law. In a democracy the statutory law is the voice of the people and should be upheld even against the majority. If a statute is not in accordance with the approval of the majority, it should be changed in a lawful manner and not by force and violence. The appellants accept the doctrines of the Communist Party and characterize the American Government as "capitalistic and bourgeoisie". Some of the revolutionary policies advocated by the Communistic literature which was received in evidence are illustrated by the following quotation:

"Only a violent defeat of the bourgeoisie, the confiscation of its property, the annihilation of the entire bourgeoisie governmental apparatus, . . . judicial, military, bureaucratic, administrative, municipal, etc. . . . Only when the dictatorship of the workers has deprived the bourgeoisie of such powerful weapons as the press, the school, . . . the church, the government apparatus, . . . " may we succeed.

This seizing of property and the overturning of govern-

ment is not to be accomplished by the peaceable means of the ballot, but by intimidation, force and violence. It is boldly declared that "a combination of lawful and unlawful work is absolutely necessary. . . . Communists are believers in force . . . our belief is ii revolutionary force. . . . The overthrow of capitalism is impossible without force, without armed uprising and proletarian wars against the bourgeoisie."

Questions based upon such unlawful means of acquiring property and destroying ordained government are incompetent. The courts of this land recognize only lawful means of acquiring property or changing the form of government. The objections to such questions were properly sustained. Abraham Lincoln, the Great Commoner of America, who was so anxious to preserve this Union, said with respect to such unlawful conduct:

"Let not him who is houseless pull down the house of another, but let him work diligently to build one for himself, thus by example insuring that his own shall be safe from violence when built."

 It was not prejudicial error for the court to sustain an objection to the question asked of the prospective juror as to whether she believed the longshoremen were justified in their dock strike at San Francisco some time ago. That strike was not involved in this case, and the circumstances surrounding it were not made known to the juror. In determining the merits of a strike it is important to consider the circumstances attending it. Peaceable strikes, picketing and mass-bargaining are recognized as lawful and valid. But undue interference with the ownership, control and use of private property and efforts to control property or secure benefits by coercion, intimidation, force or violence are clearly unlawful. Property rights or advantages gained by such unlawful and oppressive means are uniformly regarded as invalid. The question which was propounded to the juror with respect to the San Francisco strike was incompetent and misleading.

 Nor was it prejudicial error to sustain the objection to the question asked of Mrs. Lagomarsino: "Do you belong to the Catholic church?" If the juror be a member of that church, we may not presume she was therefore prejudiced against or opposed to lawful means of securing rights or demands of labor organizations. Her church affiliation was

not involved in this proceeding, and the objection to the question was properly sustained.

We have carefully reviewed each assignment of error of the nature complained of and find no undue restriction of the appellants' right to reasonably examine the jurors.

 There is evidence indicating that the appellants were members of the Communist Party and that they were engaged in strikes, parades and labor activities of that organization which organization issued, printed and distributed literature advocating force and violence to procure a change in the ownership and control of property and to destroy ordained governmental institutions. These documents were procured at the Communist Party headquarters in Sacramento, which was frequented by the appellants. There is evidence to indicate that the appellants organized, joined and managed auxiliary associations to advance the cause of Communism. That conduct was clearly in contravention of the provisions of the California Criminal Syndicalism Act. There is also evidence that the appellants participated in agricultural strikes where force and violence were used, although it may be true that the evidence fails to show that they personally instigated them or exercised force and violence therein. There is evidence that these auxiliary associations also taught the same unlawful use of force and violence which is advocated by the Communist Party, including the procuring of changes in the ownership and control of industrial property, and affecting political principles of government. Regarding the necessary elements constituting the several crimes with which the appellants are charged, it may be said that the evidence is conflicting.

Numerous books, pamphlets and documents were seized at the Communist headquarters in Sacramento which was frequented by the appellants. It was conceded that the appellants were members of the Communist Party; that they believed in and advocated those principles. These documents were offered by the prosecution and received in evidence. They announce and advocate unlawful means of confiscating private property without compensation and of destroying the institutions of ordained government. Brief excerpts from those documents read as follows:

(Exhibit No. 4. Manifesto of the Communist Party.)
" . . . The Communists everywhere support every revolutionary movement against the existing social and political order

of things. . . . The Communists disdain to conceal their views and aims. They openly declare that their ends can be attained only by *forcible overthrow* of all existing social conditions. Let the ruling classes tremble at a Communist revolution.''

(Exhibit No. 5. Thirteenth Plenum.) '' . . . There is no way out of the general crisis of capitalism other than the one shown by the October revolution, via the overthrow of the exploiting classes by the proletariat, *the confiscation of the banks, of the factories, the mines, transport, houses, the stocks and goods of the capitalists, the lands of the landlords, the church and the crown. . . .*

''The Communist Party must raise before the toilers in the United States the revolutionary way out of the crisis. All members of the Party must in their day-to-day work, in the fight for the demands of the workers, point out convincingly and insistently that only the destruction of the capitalist system, the establishment of a revolutionary workers' government, of the Soviet power, can free the millions of toilers.''

(Exhibit No. 25. Programme of the Young Communist International.) ''The ultimate aim of the C. I. and Y. C. I. is world Communism. . . . The Communists publicly declare that, in order to overthrow the capitalist system and establish the proletarian dictatorship, *the armed uprising of the proletariat is necessary.''*

(Exhibit No. 27. Foster and Ford for Food and Freedom.) '' . . . It is the aim of the Communist Party . . . *to confiscate without remuneration the great industries and the big land holdings* from the parasitic class who now own them. . . . The Communist Party of the United States is a section of the world Party of Lenin, the Communist International. It is a brother Party of the great Russian Communist Party which blazed the way for the world revolution and is now carrying through the Five-Year Plan victoriously.''

(Exhibit No. 33. Workers of the World Unite. Statutes, Thesis and Conditions of Admission to the Communist International.) ''The Communist International makes its aim to put up an armed struggle for the overthrow of the International bourgeoisie . . . and the complete abolition of the State; . . . the establishment of the dictatorship of the proletariat and of the International Soviet Republic. . . . *Only a violent defeat of the bourgeoisie, the confiscation of its property, the annihilation of the entire bourgeoisie governmen-*

*tal apparatus, parliamentary, judicial, military, bureaucratic, administrative, municipal, etc., even the individual exile or internment of the most stubborn and dangerous exploiters.*
. . . It [the Communist Party] makes the struggle especially broad, acute, and pitiless. . . . The Communists are unable to carry on their work lawfully, *a combination of lawful and unlawful work is absolutely necessary.* . . . Refusal to carry on or participate in such work should be considered equal to treason to the revolutionary cause. . . . The Communist parties . . . should also *by legal or illegal means* carry on a propaganda amongst the troops sent against the workers. . . . *Only when the dictatorship of the workers has deprived the bourgeoisie of such powerful weapons as the press, the school, parliament, the church, the government apparatus,* . . . [will it succeed]. . . . The working class cannot achieve the victory over the bourgeois by means of the general strike alone, and by the policy of folded arms. *The proletariat must resort to an armed uprising.*"

(Exhibit No. 35. A. B. C. of Communism.) "As the chief power of the State lies in the army, *it is necessary, above all things, to undermine and destroy the army.* . . . To say that the revolution can be achieved without civil war is to say that a 'peaceful' revolution is possible. . . . As well believe that a tiger can be coaxed into feeding on grass and allowing calves to live in peace. . . . Its every act shows that *it walks in the footsteps of Marx, that is, on the revolutionary pathway that leads to the forcible overthrow of the capitalist system of society.*"

(Exhibit No. 36. Program of the Communists.) "By what means is the Communist world order to be established? How are we to attain it? The answer . . . is: Through dictatorship. . . . Dictatorship means a power as strong as iron, a power which gives no quarter to its enemies, . . . which abolishes the landowners and capitalists. . . . We Communists, therefore, stand for a workers' government until the workers have gained complete control over their adversaries; until they have crushed the entire employing class and knocked out its pride, and until the employing class itself has given up all hopes of ever coming into power. . . . *Then you Communists are believers in force? We shall answer: Most certainly; but our belief is in revolutionary force.* We are convinced that by soft words the working class will gain nothing. . . . Nothing short of a revolution will over-

throw capitalism and destroy the bourgeois State. . . . Every revolution means using force against the former dominators. . . . If the bourgeoisie sends whole regiments against us, and we have the means to form regiments of the same kind, *we should be the greatest fools if we did not exert all our powers to organize, drill and educate such revolutionary red regiments.* . . . The bourgeoisie is building up a colossal, an enormous fleet, a fleet of submarines, a sea and air fleet, insanely large armies are being formed; supernatural fortifications are being built; gigantic cannons and such means of destruction as armored automobiles and tanks. *This entire fearful system of force must be destroyed. . . . That is the program of the Communist Party."*

(Exhibit No. 37. The Struggle Against Imperialist War and the Tasks of the Communists.) *"But the overthrow of capitalism is impossible without force, without armed uprising and proletarian wars against the bourgeoisie."*

These documents clearly contain numerous seditious and incendiary utterances which are revolutionary in character. They advocate a proletarian dictatorship maintained by force and violence as contrasted with a government pursuant to law. They boldly assert that the Communists intend to confiscate private property without process of law or compensation. Article IV, section 2, of the federal Constitution assures all American citizens the right to hold and control real and personal property. Both the federal and state Constitutions prohibit the taking of private property without due process of law and only upon the payment of just compensation therefor. The Communist policy denies these rights. It defies law and threatens armed revolution.

The surprising spectacle was presented at the hearing of this case when certain appellants asserted they could expect no justice at the hands of this court for the reason that its members were prejudiced against the principles of the Communist Party to which the appellants belonged, forgetting that each member of every judicial branch of our government, and every other public officer elected by any party is required to solemnly swear he will support the Constitution of the United States and uphold the law of the land in order to qualify him to hold such office.

In the case of *Gitlow* v. *New York,* 268 U. S. 652 [45 Sup. Ct. 625, 69 L. Ed. 1138], at page 1146, the Supreme Court of the United States said:

"A state may penalize utterances which openly advocate the overthrow of the representative and constitutional form of government of the United States and the several states, by violence and other unlawful means."

The California Syndicalism Act has sought to preserve its political institutions by penalizing acts and conduct which tend to destroy our government. It would be a sad commentary on our vaunted democratic system of government if the state were powerless to punish open insurrection, unlawful confiscation of property or avowed efforts to destroy our political institutions by means of force and violence.

Six separate assignments of error with respect to the introduction of oral and documentary evidence are urged by the appellants. We are of the opinion none of them constitutes reversible error.

 The court properly received in evidence a red flag which was found by an officer, together with a suitcase and personal effects belonging to the defendant Albert Hougardy, in a cabin occupied by him in Yolo County. Red flags were seen in the possession of the defendants, Nora Conklin and Lorene Norman, who carried them in a Communists' May Day parade in Sacramento. A red flag was also found in the Communist headquarters at 912½ Eighth Street in Sacramento. The evidence as to the flag was specifically restricted by the court to the case against Hougardy. It was received as tending to show "some evidence connecting the defendant Hougardy with the [Communist] organization". In 3 Century Dictionary and Cyclopedia, page 2247, it is said the red flag is "associated with blood or danger. . . . The recognized standard or symbol of an extreme revolutionary party, or of those who seek social as well as political revolution or anarchy; as, the red flag of the Commune." It is the emblem of the Russian Communists. Mr. Gallagher, attorney for some of the defendants, stated that the red flag "stands for any organization or society where the means of production are owned publicly, and operated for use, and not for profit; that it stands as a symbol of the teachings of Karl Marx and Engels; of Lenin and Stalin, the Communist International".

 The defendants were not precluded from offering evidence of its meaning. They were merely prevented from offering in evidence entire pamphlets issued by the Communist Party without first exhibiting them to the court for

714

inspection. The trial judge said in that regard: "The court will not permit it without having an opportunity to go over it and find out what the court shall consider relevant to the issue." The offer was then abandoned by the defendants.

The "Western Worker", a Communistic periodical newspaper, under date of January 22, 1934, was taken from the Communist headquarters at Sacramento with the other documents and books. It was received in evidence for the purpose of reading therefrom an excerpt in which a Communist declared that, "This flag [referring to the American flag] is not our flag. Our flag is the red flag." This merely furnished some evidence of the political principles of Communism to which the appellants adhere. It was one of the documents taken from the headquarters of the party to which they admit membership. It merely tended to affirm, what has not been denied, that their loyalty was to the red flag. That fact is not disputed.

Melville Harris, a member of the Communist Party in Sacramento, testified without objection that Nora Conklin, one of the appellants, said Mary Judge, in charge of social welfare in Sacramento County, should be taken out and lynched; that the American flag represented the capitalistic class, and that she (Nora Conklin) would spit upon it; that the only flag was the red flag, and that the United States Government should be overthrown by force and violence. This evidence was competent to prove the attitude of Nora Conklin toward Communist principles and her opposition to American political institutions. It was offered without objection. No motion was made to strike it out. The appellants may not complain of this evidence for the first time on appeal.

Carl Abbott, a police officer of Los Angeles, and a former member of the Communist Party, testified over the objection of the appellants, that he attended a Communist Party meeting in Los Angeles in March, 1930, and heard a Communist speaker say that "after the revolution" the capitalists would be stood up against a wall and shot, and other similar incendiary remarks. This evidence is remote. It should have been excluded.

The appellants complain because they were not permitted to read to the jury entire lengthy Communistic documents to refute the preceding evidence of Mr. Abbott, and to show the real attitude of the Communist Party toward women. In

the interest of expediting the trial and to prevent the encumbering of the record by the admission of immaterial matter, the court refused these offers as a whole, but said that material portions thereof affecting the questions at issue would be admitted. Such material portions of the documents were not segregated or offered. This was not an unreasonable restriction of evidence.

■ For the purpose of tracing a copy of the "Program of the Communist Party" to the possession of the defendant Caroline Decker, which document was received in evidence, Ray Kunz, an officer, in response to the question "Will you explain why you re-arrested her (Caroline Decker) at that time," replied "She was living with Jack Warnich [one of the acquitted defendants] under the name of Mr. and Mrs. John Stewart, or, Jack Stewart, 1127 U Street; I arrested them both and charged them with vagrancy." Upon motion this evidence was stricken from the record and the jury was directed to disregard it. It does not appear this answer was solicited by the prosecution. It was volunteered by the witness. It was, of course, improper. A fair inference from a reading of the entire record upon that subject leads us to the conclusion that the prosecution merely sought to connect the defendant Decker with possession of the Communistic document, which was identified and received in evidence. The prosecution disavowed a purpose of eliciting that incompetent evidence. At least, it was stricken from the record, and the jury was instructed to disregard it. We must presume the jury complied with that request of the court. It does not constitute reversible error under the circumstances of this case.

■ Forty-one assignments of alleged errors are cited by the appellants in the sustaining of objections propounded by them on cross-examination of several witnesses. It is strenuously urged the appellants were unduly restricted in their cross-examination of certain witnesses, among whom were Hanks, Harris, Abbott, Carpenter and others. We have carefully examined each assignment and have read much of the original record with relation thereto. The cross-examination of the three witnesses, the limitation of which is chiefly criticized, consumed several hundred pages each. We are of the opinion the court was very patient, and liberal in allowing the appellants great latitude in cross-examination of witnesses. There is no substantial merit in any of these assign-

ments of error. It will be observed that the trial consumed about three months' time, and there are nearly seven thousand pages of evidence.

■■■ The chief criticism is made of the limitation of the cross-examination of William Hanks, which consumes some two or three hundred pages. He was a private investigator in the employ of the criminal identification division of the state of California. He was an investigator for the United States Government during the period of the World War. He had previously been an investigator in California and elsewhere in I. W. W. disturbances, and regarding several strikes. He joined the Communist Party in Sacramento and frequently visited their headquarters and attended Communist meetings, procuring from them much of the Communist literature which was received in evidence. He made daily reports of their activities to the criminal identification division. He had testified before the grand jury which returned the indictments in this case. He knew that the Communists were suspicious of him. There was then a general gathering of Communists in Sacramento. He stated that after testifying before the grand jury he was approached at night near an alley by an unknown man who shoved a revolver in his back and told him he had "gone to the Court House once too often"; that he was "on the spot" and unless he left town immediately he would get shot. He agreed to leave Sacramento, admitting that he was afraid of losing his life. He left that night on a bus and visited relatives in Wisconsin. He did not inform the district attorney when he left, but afterwards wired him. When his absence was discovered, a Sacramento newspaper printed an article declaring that Hanks had been kidnaped. He was brought back for the trial. Believing that the district attorney had inspired this story of the purported kidnaping, the appellants zealously cross-examined Mr. Hanks on that subject. He declared that he had not been kidnaped. He denied that he ever told anyone he had been kidnaped. He insisted that he had been "put on the spot" and that his life was threatened by an unknown man. He said he did not know who the man was. He said he did not know whether the man was a Communist. The subject of this episode was pursued by the appellants on cross-examination at considerable length. They sought to connect the newspaper article with the district attorney, but failed. They attempted to elicit conversations regarding the matter with

the eastern people and others. They asked numerous questions for the purpose of disproving the newspaper article regarding the kidnaping. Many of the questions were repetitions of former ones. Objections to pursue further the subject of the kidnaping article were sustained. It was freely admitted by the witness and the prosecuting attorney that Hanks had not been kidnaped. Further examination along that line was immaterial, useless and incompetent. There was no error in finally restricting the cross-examination upon that or any of these other subjects of which the appellants complain.

 There are forty-one assignments of alleged error in receiving and rejecting certain documentary evidence. It is contended the appellants were prejudiced by permitting the prosecution to read to the jury portions only of the books, pamphlets and documents procured from the Communist headquarters, and that they were precluded from reading to the jury other portions of the same documents. There was no error in these rulings under the circumstances of this case. The court did not preclude the reading of specific designated portions of those documents. The judge repeatedly said that any other material portions of those documents could be subsequently read to the jury by the appellants. Many of them were later read to the jury. Some of them were excluded as immaterial. The court said in that regard: ''Unless you can specify what is pertinent I will rule against you.'' It does not appear that the pertinency of excluded portions of those books, pamphlets and documents was pointed out to the court. Under such circumstances the appellants may not now complain of the rulings in that regard.

 We must assume these proffered portions were immaterial. It is difficult for us to understand how any other declarations of the Communist documents which were received in evidence could reasonably explain the unlawful methods advocated by them in the paragraphs which were read to the jury by the prosecution, some of which are heretofore quoted in this opinion. We are of the opinion no reversible error appears with respect to these assignments. To predicate error for excluding unread portions of books and documents, the record should clearly point out the materiality of the omitted parts. Otherwise we are unable to determine the merit of such assignments. Every presumption is in

favor of the regularity and validity of the rulings of the court.

The appellants also assign forty other alleged errors in receiving in evidence what is termed irrelevant matter, some of which was stricken from the record on motion of the appellants and the jury was directed to disregard it. In most instances the appellants have failed to direct our attention to the record of the challenged evidence which they contend was irrelevant. The evidence which was received with relation to the attitude of the Communist Party toward marriages between white people and Negroes, and with relation to religion and the churches, contemplated only peaceable changes of the laws in those respects; they had nothing to do with advocating the confiscation of property and the destruction of ordained government by force and violence. Those matters were properly stricken from the record and the jury was directed to disregard them. A multitude of cases hold that error in the admission of evidence which neither tends to prove nor disprove the charge under consideration is harmless. (8 Cal. Jur. 615, sec. 599.) There is no reversible error in these assignments.

Nor did the court err in admitting in evidence the so-called "ancient Communist documents". They were procured from the Communist headquarters and were sold and distributed as authentic. They were received in evidence for the purpose of showing the unlawful principles of the Communist Party advocating the confiscation of property and the destruction of ordained government by force and violence. It is true that portions of the old "Communist Manifesto", dated in 1848, and of another similar document dated in 1888, were read in evidence. It is now contended the principles and program of that organization were definitely fixed and determined at the Communist Industrial Congress which convened in 1928, and that all former declarations of its principles are obsolete and inaccurate. But it does not appear that the Communist Manifesto which was adopted by the Industrial Congress in 1928, or any other subsequent declaration of principles, changed its original policy of advocating force and violence to confiscate property or to destroy government. In the absence of proof to the contrary, we must assume the principles of the Communist Party remain the

same with respect to the issues of this case as they existed in 1848 and in 1888. These challenged documents were properly received in evidence.

 Error is charged in "permitting the courtroom to take on the air of an armed camp". It is contended the appellants were prejudiced by the presence in the courtroom of uniformed officers of the law, and by permitting officers to escort the prosecution's witness, Hanks, to and from the courtroom. It does not appear the courtroom was "packed with uniformed officers". Our attention is called to no such evidence. It is the duty of a court to reasonably protect witnesses while they are engaged in testifying in a cause in court. It will be recalled that Mr. Hanks testified that his life had been threatened by a gunman, and that he was forced to leave the city on that account. Certainly it is not prejudicial for the court to permit peace officers to escort such a threatened witness to and from the courtroom. Moreover, it does not appear the court had anything to do with the presence of any officers except the regular courtroom officials. There is no error in that regard.

 Mr. Gallagher, in his brief, asserts that the appellants desire to prove a "direct tie-up between the State apparatus and the vigilantes,—to show that the theory of the Communist Party (is) that the State apparatus is to break strikes; that the State apparatus is used as an instrument of force to protect the interests of the capitalist class at the expense of the working class". Such evidence is visionary and incompetent. It would be immaterial even though the Communists believed it to be true, for it would not then justify the use of force and violence on the part of individuals or organizations to defy duly elected officers of the law or to destroy the government. Every presumption is in favor of the lawful exercise of the duties of public officers. The theory that state officers and institutions are secretly procured contrary to their oaths and avowed purposes to interfere unlawfully and violently with peaceful strikes in the interest of the capitalistic class and against the rights of the working class is erroneous and fanciful. That extravagant theory is the creation of a prejudiced mind. It is not susceptible of proof. There was no error in refusing to consume the time of the court and jury in pursuing such a phantasm.

The appellants complain of forty-eight rulings of the court unreasonably restricting them in their direct examination of witnesses. In several instances we are of the opinion the evidence which was excluded was competent, and might well have been received. The scope of investigation under the circumstances of this case is so broad that it is often difficult to determine just where the limit should be enforced. However, upon a thorough reading of the record affecting the questions involved in these objections, we are of the opinion the appellants were not unduly restricted in that regard.

The appellants contend they were precluded from having a fair and impartial trial for the reason that prejudicial newspaper articles and editorials were published in Sacramento and elsewhere during the progress of the trial. A motion was presented to declare a mistrial and also a motion to cite the editors of those newspapers for contempt of court on that account. Both motions were denied. A motion for a new trial based upon that ground, among others, was subsequently denied. Our attention is not called to the record indicating that these alleged prejudicial articles were offered in evidence upon any of those motions. It is true that partisan articles, either favorable to or against an accused person, which are published during the trial of a criminal case, may unconsciously influence a jury so as to cause a miscarriage of justice. Jurors are presumed to determine the guilt or innocence of an accused person solely upon the evidence which is adduced at the trial, exclusive of any extraneous matters which may come to their attention. It is dangerous and highly improper for jurors to read such newspaper articles while they are engaged in trying a criminal case. In the interest of fair play, managers of newspapers should refrain from publishing partisan comments upon the effect of evidence adduced at the trial of a pending case. Judgments of conviction have been set aside on the presumption that such prejudicial articles have prevented fair and impartial trials. It may not be presumed, however, that an accused person is not accorded a fair and impartial trial merely because prejudicial articles appear in the local press during the trial of his case. It must also appear that the jurors read the prejudicial articles, or that the contents thereof were brought to their attention.

Since our attention is not called to the offer of these newspaper articles as evidence upon any of the motions with respect to their effect upon the verdicts, we may not take judicial notice of their contents. Nor may we presume they were read by the jurors or that their verdicts were prejudicially affected thereby.

■ Numerous errors are assigned in giving and refusing to give proffered instructions. We have examined these challenged instructions and are of the opinion there is no substantial error in that regard. The jury was very fully and fairly instructed regarding the principles of law which are applicable to this case. Among the proposed instructions which were refused are several which were drawn on the theory that the advocacy and use of force and violence by individuals or associations representing a majority of the citizenry are justifiable when a minority which is in official control prevents the majority from bringing about changes in industrial ownership or control of property or of political institutions in a peaceable manner. These instructions were properly refused. They do not constitute correct declarations of law. There is no lawful authority on the part of individuals or organizations, even though they may belong to the majority of the citizenry, to take the law into their own hands and advocate or use force and violence to obtain political control, or to appropriate property without due process of law or compensation therefor, or to change the form of government. Such an assumed situation is remote and improbable. It would constitute defiance to the will of the majority amounting to insurrection. The law furnishes ample means of correcting such abuses of official power. The proposed instructions were properly refused.

■ Over seventy incidents which occurred during the progress of the trial are cited by the appellants as proof of alleged prejudicial misconduct on the part of the trial judge and the prosecuting officers. We have examined each of these charges and are of the opinion that none of them constitutes prejudicial misconduct under the circumstances of this case. Throughout a very lengthy and arduous trial the judge appeared to have been extremely patient and very fair and impartial in his rulings. The trial, which lasted for months, was hotly contested. It involved divergent views of opposite

schools of thought with respect to political principles of government. The language employed in frequent encounters between counsel regarding the issues of the case was acrimonious. Statements were made by counsel on both sides of the case which should have been omitted. Such conflicts are not conducive to proper decorum or orderly procedure of court trials. Much may be excused on account of the earnestness and zeal of respective counsel. Many of the retorts of the prosecuting officers were invited by similar improper remarks of adverse counsel. Extravagant statements were made by counsel on both sides in their arguments to the jury. We are unable to say that any of these challenged statements of the prosecuting officers were illegitimate arguments upon fair theories deducible from the evidence. At least, we are convinced there is no reversible error in any of these assigned incidents.

The effect of conflicting irreconcilable verdicts which were rendered in this case, however, compels us to reverse the judgment. There is no escape from that conclusion. It will be recalled that these appellants with nine other persons were jointly charged in two separate indictments with syndicalism, and a conspiracy to commit that offense. Demurrers were sustained to all but counts IV and VI of the first indictment numbered 12889. The two indictments were consolidated and tried together. The first indictment charged the defendants with organizing, joining, managing and directing certain Communistic associations for the purpose of advocating, teaching, aiding and abetting criminal syndicalism as a means of accomplishing a change in industrial ownership of property and to effect political changes. The first indictment also charged them with a *conspiracy to accomplish the same purposes* by organizing those named associations, and by printing, circulating and distributing books, circulars and documents which advocate a change in industrial ownership and control of property and of political changes by force and violence. This indictment does not enumerate or identify the unlawful documents which the defendants were charged with circulating.

The second indictment number 12908 charges that the defendants did "by spoken and written words and personal conduct advocate, teach, aid and abet Criminal Syndicalism" to accomplish changes in industrial ownership and control

of property and effecting political changes by means of force and violence, and that, for such purposes, they did publish, edit, circulate and display books, pamphlets and documents advocating criminal syndicalism, which said documents consisted of over thirty different pamphlets separately identified and referred to in this indictment by title. These documents which were designated in the second indictment are the identical ones procured from the Communist headquarters at Sacramento, received in evidence at the trial, and relied upon by the prosecution in proof of the allegations which are contained in the first indictment. They are the ones from which we have previously quoted.

The cause was dismissed as to two of the defendants. Seven other defendants were acquitted of all charges contained in both indictments. The appellants were acquitted of all charges contained in the second indictment, numbered 12908. The jury thereby deliberately found by the last-mentioned verdict that none of the appellants advocated, taught, aided or abetted criminal syndicalism by means of written or printed words, by spoken language or by personal conduct. The verdict of not guilty of the charges alleged in the second indictment must be construed to mean that the appellants did not edit, publish, issue, circulate or display any one of the enumerated documents or pamphlets mentioned therein and relied upon to prove the allegations of the first indictment. It seems clear and inescapable that since the appellants were deliberately acquitted by the jury of resorting to *written or spoken language or personal conduct,* to advocate, teach, aid or abet criminal syndicalism, it would be impossible for them to have organized, managed, or joined associations for the purpose of teaching criminal syndicalism, or to aid, abet, or advocate those principles by circulating or distributing documents or pamphlets, or that they conspired by such means to commit the alleged crime.

It is true that the jury found the appellants guilty of counts IV and VI of the first indictment at the same time that it acquitted them of all the charges of the second indictment. It also acquitted the other seven defendants of all counts of both indictments. It is impossible to reconcile these verdicts. They are a part of the same trial and all depend upon identical evidence. The verdict on the second indictment specifically acquits the appellants of publishing, issuing,

circulating or distributing any and all of the Communist literature relied upon by the prosecution in this case. That leaves no other material portion of the first indictment except the charge that the appellants organized, managed and joined associations for the purpose of advocating and teaching criminal syndicalism and that they conspired to commit the crime in the same manner. The verdict on the second indictment nullifies the verdict on the first indictment by impliedly finding that the appellants did not use "spoken or written words" or exercise "personal conduct" in teaching, advocating, aiding or abetting criminal syndicalism. If that be true, then we would be bound to assume they did not organize, manage or join associations created for the purpose of teaching or advocating criminal syndicalism, for those acts could be performed only by the use of written or spoken language, or by the exercise of personal conduct. Under such circumstances, neither could they conspire to commit criminal syndicalism without the use of written or spoken language or by the exercise of personal conduct.

Since the appellants were effectually acquitted by necessary inference of all the charges involved in both indictments we must hold that the verdict which was rendered against them on the two counts of the first indictment is in irreconcilable conflict therewith and that it is therefore void and ineffectual. No good will be subserved by a second trial. We are of the opinion the verdict of acquittal which was rendered by the jury on the second indictment will furnish conclusive proof of a former acquittal of the charges contained in the first indictment.

The judgment and the order are reversed, and the appellants are discharged from custody.