[L. A. No. 19729. In Bank. June 26, 1946.]

KENNETH L. DANSKIN et al., Petitioners, v. SAN DIEGO UNIFIED SCHOOL DISTRICT et al., Respondents.

A. L. Wirin and J. B. Tietz for Petitioners.

Thomas Whelan, District Attorney (San Diego), and Carroll H. Smith, Chief Trial Deputy District Attorney, for Respondents.

William C. Ring as Amicus Curiae on behalf of Respondents.

TRAYNOR, J.—Petitioners are members and officers of the San Diego Civil Liberties Committee affiliated with the American Civil Liberties Union. On January 10, 1946, they filed an application with respondent board for the use of the Roosevelt Junior High School Auditorium for a series of meetings on the general theme of the "Bill of Rights in Postwar America." Speakers were to include the late Judge John Beardsley of the Superior Court of Los Angeles, Colonel Evans F. Carlson, Thomas Whelan, District Attorney of San Diego County; George R. Baird, United States Commissioner; Reverend Edward Radcliff, Dr. W. P. Winters, Reverend Kenneth L. Danskin, one of the petitioners herein, and Clarence Novotny. In December, 1945, the board had adopted rules and regulations to govern the use of school property for public purposes and as a civic center. In their application, petitioners stated that they would not comply with rules 4, 7, 11, 17 and 20*, which they claimed were in

---

*These rules provide:

"4. Pursuant to Section 8271 Education Code no public meeting or entertainment held on the school property will be permitted to reflect in

violation not only of the Civic Center Act (Ed. Code, §§ 19431-19439), but of their constitutional rights. On January 15, 1946, the board adopted a resolution granting permission to petitioners to use the auditorium upon the sole condition that the persons who signed the application subscribe to and file with the board the following oath:

"I, . . ., being first duly sworn, on oath say:

"I am a member of the San Diego Civil Liberties Committee affiliated with the Southern California Branch of the American Civil Liberties Union and one of the applicants for the use of Roosevelt Junior High School auditorium for a series of meetings on January 25th, February 22nd, March 22nd, April 26th, May 24th, and June 28, 1946.

"I do not advocate and I am not affiliated with any organization which advocates or has as its object or one of its objects the overthrow of the present Government of the United States or of any State by force or violence, or other unlawful means."

Petitioners refused to comply with this condition on the grounds that it violates not only the Civic Center Act but the Constitution of the United States and the Constitution of

---

any way upon citizens of the United States because of their race, color, or creed.

"7. The Governing Board may require that it be furnished reasonably in advance with a complete program, with copies of all speeches and addresses and script of any entertainment proposed to be given in school property. If such copy reasonably demonstrates that the program will be in violation of law or of these rules, the proposed use shall not be permitted.

"11. Permission to use school facilities will be granted in accordance with a schedule of charges adopted by the Board of Education from time to time. Copies of the same may be obtained on application.

"17. Any individual group or organization using school property for Civic Center or other purposes shall hold the San Diego Unified School District, its Governing Board, the individual members thereof, and all District officers, agents and employees free and harmless from any loss, damage, liability, cost or expense that may arise during or be caused in any way by such use or occupancy of school property.

"20. Upon receipt of notice that a permit has been issued to a non-school agency for use, the principal in charge of the school shall designate a regular employee to open the building, be in charge during the use, and to close the building after the use. The School District employee in charge of the building or grounds, within or upon which any meeting may be held, is empowered to take all necessary means to enforce these rules. If the use requires service outside of the regular hours of the employee's assignment, he shall be reimbursed at the rate of $1.00 per hour with a minimum for any opening of $2.00."

California. Respondent board refuses to grant the use of the auditorium to petitioners except upon this condition. By this proceeding in mandamus petitioners seek to compel respondent board to grant them permission to use the auditorium free of this condition.

Under the Civic Center Act (Ed. Code, §§ 19431-19439) the governing boards of school districts must grant the free use of school auditoriums for the purposes specified in section 19431 of the Education Code, which provides: "There is a civic center at each and every public school building and grounds within the State where the citizens, parent-teachers' association, Campfire Girls, Boy Scout troops, farmers' organizations, clubs, and associations formed for recreational, educational, political, economic, artistic, or moral activities of the public school districts may engage in supervised recreational activities, and where they may meet and discuss, from time to time, as they may desire, any subjects and questions which in their judgment appertain to the educational, political, economic, artistic and moral interests of the citizens of the communities in which they reside."

Section 19432 (as amended by Stats. 1945, ch. 1213) provides: "Any use, by any individual, society, group, or organization which has as its object or as one of its objects, or is affiliated with any group, society, or organization which has as its object or one of its objects the overthrow or the advocacy of the overthrow of the present form of government of the United States or of the State by force, violence, or other unlawful means shall not be granted, permitted, or suffered.

"Any person who is affiliated with any organization, which advocates or has for its object or one of its objects the overthrow of the present government of the United States or any State, Territory, or Possession thereof, by force or violence or other unlawful means, or any organization of persons which advocates or has for its object or one of its objects the overthrow of the present government of the United States or any State, Territory, or Possession thereof, by force or violence or other unlawful means, is hereby declared to be and is characterized, a subversive element.

"Notwithstanding any of the other terms of this chapter, no such governing board shall grant the use of any school property to any person or organization who or which is a subversive element as herein defined.

"For the purpose of determination by such governing

board whether or not such person or such organization of persons applying for the use of such school-property, is a subversive element as herein defined, such governing board may require the making and delivery to such governing board, by such person or any members of such organization, of affidavits in form prescribed by such governing board, stating facts showing whether or not such person or organization is a subversive element as herein defined.

"Reference is hereby made to the provision of law relating to perjury and the punishment therefore shall be applicable to persons making and delivering affidavits provided for under the provisions of this chapter."

Pursuant to this section the board has provided in its rules and regulations that "No use or occupancy of school property will be permitted by any subversive element as defined in section 19432 Education Code. For the purpose of aiding in the determination of whether or not any person or organization applying for use of school property is a subversive element, the Governing Board may in its discretion require the making and delivery to it, by such person or any member of such organization, or any speaker, of affidavits in form approved by the District Attorney and County Counsel, stating facts showing whether or not such person or organization or speaker is a subversive element as defined in said section."

Petitioners contend that the board acted arbitrarily in requiring them to file affidavits, on the ground that they are known as law-abiding citizens and their organization is known as an important civic organization whose purposes are recognized as useful by the President of the United States and that during the last five years no one has heretofore been required to furnish the affidavits required of petitioners. Section 19432 as it now reads is based on an amendment to the Education Code, which became effective on September 15, 1945. Before that date the section did not contain the definition of a subversive element or the provisions concerning the filing of affidavits. The rules and regulations of the board were adopted in December, 1945, and the affidavits were required of petitioners on January 15, 1946. If the section is valid, it is clear that the board acted reasonably when it provided for affidavits in its rules in conformity with the legislative amendment. In view of the recent change in the statute it is immaterial that during the past five years other applicants were not required to furnish affidavits. The validity

of the regulation depends therefore upon the validity of section 19432 of the Education Code.

Petitioners contend that this section on its face violates freedom of speech and of peaceable assembly as guaranteed by the Constitution of the United States and the Constitution of California.

 Freedom of speech and of peaceable assembly are protected by the First Amendment of the Constitution of the United States against infringement by Congress. They are likewise protected by the Fourteenth Amendment against infringement by state Legislatures. (*Thomas* v. *Collins,* 323 U.S. 516, 530 [65 S.Ct. 315, 89 L.Ed. 430] ; *De Jonge* v. *Oregon,* 299 U.S. 353, 364 [57 S.Ct. 255, 81 L.Ed. 278].) However reprehensible a Legislature may regard certain convictions or affiliations, it cannot forbid them if they present "no clear and present danger that they will bring about the substantive evils" that the Legislature has a right to prevent. "It is a question of proximity and degree." (*Schenck* v. *United States,* 249 U.S. 47, 52 [39 S.Ct. 247, 63 L.Ed. 470].) The United States Supreme Court has been alive to the difference between negligible dangers and substantial ones, between remote dangers and immediate ones. In *Bridges* v. *California,* 314 U.S. 252, 261 [62 S.Ct. 190, 86 L.Ed. 192], it declared: "As Mr. Justice Brandeis said in his concurring opinion in *Whitney* v. *California,* 274 U.S. 357, 374 [47 S.Ct. 641, 71 L.Ed. 1095] : 'This court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present.' Nevertheless the 'clear and present danger' language of the Schenck case has afforded practical guidance in a great variety of cases in which the scope of constitutional protections of freedom of expression was in issue. It has been utilized by either a majority or minority of this Court in passing upon the constitutionality of convictions under espionage acts, *Schenck* v. *United States, supra; Abrams* v. *United States,* 250 U.S. 616 [40 S.Ct. 17, 63 L.Ed. 1173] ; under a criminal syndicalism act, *Whitney* v. *California, supra;* under an 'anti-insurrection' act, *Herndon* v. *Lowry, supra,* [301 U.S. 242 (57 S.Ct. 732, 81 L.Ed. 1066)] ; and for breach of the peace at common law, *Cantwell* v. *Connecticut, supra,* [310 U.S. 296 (60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352)]. And very recently we have also suggested that 'clear and present danger' is an appropriate guide in determining the

constitutionality of restrictions upon expression where the substantive evil sought to be prevented by the restriction is 'destruction of life or property, or invasion of the right of privacy', *Thornhill* v. *Alabama,* 310 U.S. 88, 105 [60 S.Ct. 736, 84 L.Ed. 1093]. Moreover, the likelihood, however great, that a substantive evil will result cannot alone justify a restriction upon freedom of speech or the press. The evil itself must be 'substantial', Brandeis, J., concurring in *Whitney* v. *California, supra,* 274 U.S. at page 374; it must be 'serious', id. 274 U.S. at page 376. And even the expression of 'legislative preferences or beliefs' cannot transform minor matters of public inconvenience or annoyance into substantive evils of sufficient weight to warrant the curtailment of liberty of expression. *Schneider* v. *State,* 308 U.S. 147, 161 [60 S.Ct. 146, 84 L.Ed. 155]. What finally emerges from the 'clear and present danger' cases is a working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished.''

When the United States Supreme Court held in *Bridges* v. *California, supra,* that the suppression of freedom of speech in the absence of a clear and present danger of substantive evils is a violation of the constitutional guaranty of free speech, it adopted the views of Mr. Justice Holmes and Mr. Justice Brandeis in their minority opinions in *Gitlow* v. *New York,* 268 U.S. 652, 672 [45 S.Ct. 625, 69 L.Ed. 1138] ; *Whitney* v. *California,* 274 U. S. 357, 372 [47 S.Ct. 641, 71 L.Ed. 1095], and other cases. These opinions were based on the reasoning that doctrines advocating the overthrow of the government by force do not of themselves constitute a substantial danger, and that the state is therefore not justified in suppressing the freedom of speech of those who happen to be members of an organization committed to such doctrines. In the Bridges case the court referred to language in the opinions of those justices to amplify its statements as follows: ''Restatement of the phrase 'clear and present danger' in other terms has been infrequent. Compare, however: 'the test to be applied . . . *is not the remote or possible effect'.* Brandeis, J., dissenting in *Schaefer* v. *United States,* 251 U.S. 466, 486 [40 S.Ct. 259, 64 L.Ed. 360] ; 'we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, *unless they so imminently threaten immediate interference*

544

*with the lawful and pressing purposes of the law that an immediate check is required to save the country'.* Holmes, J., dissenting in *Abrams* v. *United States,* 250 U.S. 616, 630 [40 S.Ct. 17, 63 L.Ed. 1173]: 'To justify suppression of free speech *there must be reasonable ground to fear that serious evil will result* if free speech is practiced. *There must be reasonable ground to believe that the danger apprehended is imminent'.* Brandeis, J., concurring in *Whitney* v. *California,* 274 U.S. 357, 376 [47 S.Ct. 641, 71 L.Ed. 1095]. The italics are ours.'' (314 U.S. 262, Note 5; see, also, *Thomas* v. *Collins,* 323 U.S. 516, 527 [65 S.Ct. 315, 89 L.Ed. 430].) It follows from this principle that a Legislature that makes convictions and affiliations a condition of free speech is striking at something less than clear and present danger. (See, *West Virginia State Bd. of Education* v. *Barnette,* 319 U.S. 624, 640-642 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].)

█ It is contended that section 19432 of the Education Code merely supplements the California Criminal Syndicalism Act (Stats. 1919, p. 281; 3 Deering's Gen. Laws, Act 8428), the constitutionality of which was upheld by the United States Supreme Court and the courts of this state. (*Whitney* v. *California, supra,* 274 U.S. 357; *People* v. *Steelik,* 187 Cal. 361 [203 P. 78]; *People* v. *Malley,* 49 Cal.App. 597 [194 P. 48]; *People* v. *Chambers,* 22 Cal.App.2d 687 [72 P.2d 746].) The decisions upholding the constitutionality of that act, however, particularly *Whitney* v. *California, supra,* must now be read in the light of the United States Supreme Court's holding in *Bridges* v. *California, supra,* (see, also, *Pennekamp* v. *Florida,* —— U.S. —— [66 S.Ct. 1029, 90 L.Ed. ——], (June 3, 1946); *Thomas* v. *Collins,* 323 U.S. 516, 540 [65 S.Ct. 315, 89 L.Ed. 430].) One must therefore look to the concurring opinion of Justices Brandeis and Holmes in the Whitney case for the reasons why the act as applied in that case was constitutional. Applying the clear and present danger test to the case Brandeis, J., said in his concurring opinion: ''I am unable to assent to the suggestion in the opinion of the Court that assembling with a political party, formed to advocate the desirability of a proletarian revolution by mass action at some date necessarily far in the future, is not a right within the Fourteenth Amendment. In the present case, however, there was other testimony which tended to establish the existence of a conspiracy on the part of the International Workers of the World, to commit present serious

crimes; and likewise, to show that such a conspiracy would be furthered by the activity of the society of which Miss Whitney was a member. Under these circumstances the judgment of the state court cannot be disturbed.'' The Criminal Syndicalism Act can thus be applied only when there is imminent danger that the advocacy of the doctrines it seeks to prohibit will give rise to evils that the state may prevent. It follows that the act cannot be constitutionally supplemented by a provision which is not even directed specifically against the advocacy of revolutionary doctrines, but which would suppress speech and assembly on any subject by the advocates of such doctrines or by those who are merely affiliated with such advocates. ■ Since the state cannot suppress free expression except in the presence of clear and present danger, it cannot enforce a precautionary measure that would deny the right of assembly to those whose political creeds it disapproves.

■ One must inquire why the measure in question seeks to prohibit ''subversive elements'' from holding meetings in a school building, when presumably they can hold them elsewhere without arousing fears of baneful consequences. Is it reasonable to suppose that meetings that would be harmless elsewhere would take on a sinister quality in a school building? When one searches deeper for the reason that motivates the prohibition of such meetings, there is no escaping the conclusion that the Legislature denies access to a forum in a school building to ''subversive elements,'' not because it believes that their public meetings would create a clear and present danger to the community, but because it believes the privilege of free assembly in a school building should be denied to those whose convictions and affiliations it does not tolerate. What it does not tolerate it seeks to censor.

■ The state is under no duty to make school buildings available for public meetings. (See 86 A.L.R. 1195, 47 Am. Jur. 344.) If it elects to do so, however, it cannot arbitrarily prevent any members of the public from holding such meetings. (*Missouri ex rel. Gaines* v. *Canada,* 305 U.S. 337, 349 [59 S.Ct. 232, 83 L.Ed. 208]; see *Marsh* v. *Alabama,* 326 U.S. 501 [66 S.Ct. 276, 280, 90 L.Ed. ——].) Nor can it make the privilege of holding them dependent on conditions that would deprive any members of the public of their constitutional rights. ■ A state is without power to impose an unconstitutional requirement as a condition for grant-

ing a privilege even though the privilege is the use of state property. (*Frost* v. *Railroad Commission of California*, 271 U.S. 583, 594 [46 S.Ct. 605, 70 L.Ed. 1101]; *Hague* v. *CIO*, 307 U.S. 496, 515 [59 S.Ct. 954, 83 L.Ed. 1423]; *Murdock* v. *Pennsylvania*, 319 U.S. 105, 110-111 [63 S.Ct. 870, 891, 87 L.Ed. 1292, 146 A.L.R. 81]; see the brief of the Bill of Rights Committee of the American Bar Association filed in *Hague* v. *CIO, supra,* reprinted in 25 American Bar Association Journal, 7, 8, 74.)

Since the state cannot compel "subversive elements" directly to renounce their convictions and affiliations, it cannot make such a renunciation a condition of receiving the privilege of free assembly in a school building. Such a condition is as unconstitutional as the condition that a foreign corporation pay a tax for the privilege of doing business that could not otherwise be constitutionally imposed on it (*Western Union Telegraph Co.* v. *Kansas,* 216 U.S. 1 [30 S.Ct. 190, 54 S.Ct. 355]), or agree to abstain from resort to the federal courts (*Terral* v. *Burke Construction Co.,* 257 U.S. 529 [42 S.Ct. 188, 66 L.Ed. 352]), or the condition that a public carrier obtain a certificate of public convenience and necessity before using the public roads. (*Frost* v. *Railroad Commission of California, supra,* 271 U.S. 583.)

There is a parallel between the privilege in question and the privilege of using the mails at less than cost. In *Hannegan* v. *Esquire,* 327 U.S. 146 [66 S.Ct. 456, 461, 90 L.Ed. ——], Mr. Justice Douglas speaking for the court declared: "But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. See the dissents of Mr. Justice Brandeis and Mr. Justice Holmes in *United States ex rel. Milwaukee Social Democratic Publishing Co.* v. *Burleson,* 255 U.S. 407, 421-423, 430-432, 437, 438 [41 S.Ct. 352, 65 L.Ed. 704]. Under that view the second class rate could be granted on condition that certain economic or political ideas not be disseminated. The provisions of the Fourth condition would have to be far more explicit for us to assume that Congress made such a radical departure from our traditions and undertook to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country." The dissent of Mr. Justice Brandeis in the Burleson case to which the court referred in the Esquire case stated: "Congress may not through

its postal police power put limitations upon the freedom of the press which if directly attempted would be unconstitutional. This court also stated in Ex parte Jackson that 'Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' It is argued that although a newspaper is barred from the second-class mail, liberty of circulation is not denied, because the first and third-class mail and also other means of transportation are left open to a publisher. Constitutional rights should not be frittered away by arguments so technical and unsubstantial. 'The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.' (*Cummings* v. *Missouri*, 4 Wall. 277, 325 [18 L.Ed. 356].) The Government might, of course, decline altogether to distribute newspapers; or it might decline to carry any at less than the cost of the service; and it would not thereby abridge the freedom of the press, since to all papers other means of transportation would be left open. But to carry newspapers generally at a sixth of the cost of the service and to deny that service to one paper of the same general character, because to the Postmaster General views therein expressed in the past seem illegal, would prove an effective censorship and abridge seriously freedom of expression.'' (255 U.S. 407, 430-431.)

The convictions or affiliations of one who requests the use of a school building as a forum are of no more concern to the school administrators than to a superintendent of parks or streets if the forum is the green or the market place. ██ The ancient right to free speech in public parks and streets cannot be made conditional upon the permission of a public official, if that permission is used as an "instrument of arbitrary suppression of free expression.'' (*Hague* v. *CIO*, 307 U.S. 496, 516 [59 S.Ct. 954, 83 L.Ed. 1423] ; *In re Porterfield, ante,* 91, 101 [168 P.2d 706].) It is true that the state need not open the doors of a school building as a forum and may at any time choose to close them. Once it opens the doors, however, it cannot demand tickets of admission in the form of convictions and affiliations that it deems acceptable. Censorship of those who would use the school building as a forum cannot be rationalized by reference to its setting. School desks and blackboards, like trees or street lights, are but the trappings of the forum; what imports is the meeting of minds and not the meeting place.

█ The very purpose of a forum is the interchange of ideas, and that purpose cannot be frustrated by a censorship that would label certain convictions and affiliations suspect, denying the privilege of assembly to those who hold them, but granting it to those whose convictions and affiliations happen to be acceptable and in effect amplifying their privilege by making it a special one. In the competitive struggle of ideas for acceptance they would have a great strategic advantage in making themselves known and heard in a forum where the competition had been diminished by censorship, and their very freedom would intensify the suppression of those condemned to silence. It is not for the state to control the influence of a public forum by censoring the ideas, the proponents, or the audience; if it could, that freedom which is the life of democratic assembly would be stilled. And the dulling effects of censorship on a community are more to be feared than the quickening influence of a live interchange of ideas.

█ If it is unconstitutional for the state to prohibit certain persons or groups classified as ''subversive elements'' from exercising their rights of free speech and assembly at places where others are allowed to speak and assemble, it is *a fortiori* unconstitutional to require proof from any persons or groups that they are not subversive elements. ''If the exercise of the rights of free speech and free assembly cannot be made a crime, we do not think this can be accomplished by the device of requiring previous registration as a condition for exercising them and making such a condition the foundation for restraining in advance their exercise and for imposing a penalty for violating such a restraining order. So long as no more is involved than the exercise of the rights of free speech and free assembly, it is immune to such a restriction.'' (*Thomas* v. *Collins,* 323 U.S. 516, 540 [65 S.Ct. 315, 89 L.Ed. 430]; see, also, *Near* v. *Minnesota,* 283 U.S. 697, 713 [51 S.Ct. 625, 75 L.Ed. 1357].) In the present case registration would be a reasonable requirement, facilitating the administration of meetings and imposing no censorship on the proponents. Requirement of proof of one's convictions and affiliations, however, as a condition of exercising the rights of free speech and free assembly, would compel a forfeiture of those rights by those who were unable or unwilling to submit proof that was acceptable.

Respondents contend that an affidavit like that required

of petitioners is similar to the test oath held constitutional in *Cohen* v. *Wright,* 22 Cal. 293, and *Ex parte Yale,* 24 Cal. 241 [85 Am.Dec. 62]. The question whether a test oath is a permissible mode of proof is pertinent only when proof can constitutionally be required. Moreover, these cases related to statutes enacted after the Civil War requiring litigants, as a condition to the maintenance of actions in the courts of this state, and attorneys, as a condition to admission to practice, to file affidavits disclaiming any participation in the Civil War on the side of the Confederate States. Similar statutes were held unconstitutional by the United States Supreme Court on the grounds that they were *ex post facto* laws and bills of attainder and that they ''subvert the presumptions of innocence, and alter the rules of evidence, which heretofore, under the universally recognized principles of the common law, have been supposed to be fundamental and unchangeable. They assume that the parties are guilty; they call upon the parties to establish their innocence; and they declare that such innocence can be shown only in one way— by an inquisition in the form of an expurgatory oath, into the consciences of the parties.'' (*Cummings* v. *Missouri,* 4 Wall. (U.S.) 277, 328 [18 L.Ed. 356]; *Ex parte Garland,* 4 Wall. (U.S.) 333 [18 L.Ed. 366].)

The present case is clearly distinguishable from *Communist Party* v. *Peek,* 20 Cal.2d 536 [127 P.2d 889]. That case was concerned with a statute that excluded from primary elections political parties that advocate the overthrow of the government by unlawful means or by ''a program of sabotage, force and violence, sedition or treason against, the Government of the United States or of this State.'' In providing for such exclusion, the Legislature exercised its power under section 2½ of article II of the California Constitution ''to determine the tests and conditions upon which electors, political parties, or organizations of electors may participate in any such primary election.'' The power of the Legislature under the Constitution of this state to determine the conditions upon which political parties may participate in primary elections concerns, not the fundamental rights of free speech and of peaceable assembly, but the selection of persons to fill positions of responsibility in the government service. (See *Lelande* v. *Lowery,* 26 Cal.2d 224, 229 [157 P.2d 639]; *Schostag* v. *Cator,* 151 Cal. 600, 605 [91 P. 502]; *Heney* v. *Jordan,* 179 Cal. 24, 27 [175 P. 402]; *Socialist Party* v. *Uhl,* 155 Cal.

776, 790 [103 P. 181].) These cases involved the general test of reasonableness under the due process clause, whereas the present case calls for the application of the strict standard of the First Amendment, which in the fields protected by that amendment are read into the Fourteenth Amendment. In the words of the United States Supreme Court: ". . . it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a state to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a Legislature may have a 'rational basis' for adopting. But freedom of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the state may lawfully protect." (*West Virginia State Bd. of Edu.* v. *Barnette,* 319 U.S. 624, 639 [63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674].)

The state can of course safeguard the primary purposes of public property from interference by other uses that it permits. Under the Civic Center Act "the educational activities of schools shall at all times take precedence over other permissive but secondary uses of school buildings" and a school board must "consider the probable effect of the proposed use on the regular school program and must deny one that would lead to an interference with that program." (*Payroll Guaranty Association* v. *Board of Education,* 27 Cal.2d 197, 203 [163 P.2d 433, 161 A.L.R. 1300].) This consideration is not relevant here, however, for the provisions in question relate, not to the educational program of the schools, but to the protection of the community from "subversive elements." They purport to protect the community, not by preventing outright the use of school buildings for meetings for the dissemination of subversive doctrines, but by denying the privilege of holding a public meeting at a civic center to "subversive elements" or to anyone who refuses to prove that he is not subversive,

even though they would devote their meetings to the purposes designated in the Civic Center Act, and even though there is no reason to suppose that anyone at such meetings would advocate the overthrow of the government. Those who are under the ban of the statute could not hold a meeting to pronounce their views with regard to pending legislation, constitutional amendments, election of political candidates, or even artistic or educational matters. It is a drastic censorship that would not tolerate the presentation in a public forum of the views on any subject of those whose convictions and affiliations it disapproves. Its principal effect is not to prevent abuses of free speech, but to discourage certain convictions and affiliations and to stifle the freedom of speech on any subject of those who hold them. ''The power of the licensor against which John Milton directed his assault by his 'Appeal for the Liberty of Unlicensed Printing' is pernicious not merely by reason of the censure of particular comments but by reason of the threat to censure comments on matters of public concern. It is not merely the sporadic abuse of power by the censor but the pervasive threat inherent in its very existence that constitutes the danger to freedom of discussion.'' (*Thornhill* v. *Alabama,* 310 U.S. 88, 97 [60 S.Ct. 736, 84 L.Ed. 1093] ; see, also, *Near* v. *Minnesota, supra,* 283 U.S. 697, 713; *In re Porterfield, ante,* 91, 101 [168 P.2d 706].)

There is a close analogy between the present case and the suppression of a public meeting by criminal prosecution, held invalid in *De Jonge* v. *Oregon,* 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278]. In that case a defendant was convicted of violating an Oregon statute similar to the California act prohibiting criminal syndicalism, which contained a provision that, as construed by the state court, made it a crime to preside over or participate in a public meeting held under the auspices of an organization advocating criminal syndicalism, even though the meeting was not devoted to the advocacy of criminal syndicalism. The United States Supreme Court was not concerned with the constitutionality of the Oregon criminal syndicalism statute as a whole but had to determine only whether, even if its other provisions were constitutional, their operation could be secured by a precautionary measure like the one in question. Speaking for the court, Mr. Chief Justice Hughes stated : ''While the states are entitled to protect themselves from the abuse of the privileges of our institutions through an attempted substitution of force and violence in

the place of peaceful political action in order to effect revolutionary changes in government, none of our decisions go to the length of sustaining such a curtailment of the right of free speech and assembly as the Oregon statute demands in its present application. . . . Freedom of speech and of the press are fundamental rights which are safeguarded by the due process clause of the Fourteenth Amendment to the Federal Constitution. . . . The right of peaceable assembly is a right cognate to those of free speech and free press and is equally fundamental. As this court said in *United States* v. *Cruikshank*, 92 U.S. 542, 552 [23 L.Ed. 588] : 'The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.' The First Amendment of the Federal Constitution expressly guarantees that right against abridgement by Congress. But explicit mention there does not argue exclusion elsewhere. For the right is one that cannot be denied without violating those fundamental principles of liberty and justice which lie at the base of all civil and political institutions—principles which the Fourteenth Amendment embodies in the general terms of its due process clause. *Hebert* v. *Louisiana*, 272 U.S. 312, 316 [47 S.Ct. 103, 71 L.Ed. 270] ; *Powell* v. *Alabama*, 287 U.S. 45, 67 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527] ; *Grosjean* v. *American Press Co.* [297 U.S. 233 (56 S.Ct. 444, 80 L.Ed. 660)], *supra.* These rights may be abused by using speech or assembly in order to incite to violence and crime. The people through their Legislatures may protect themselves against that abuse. But the legislative intervention can find constitutional justification only by dealing with the abuse. The rights themselves must not be curtailed. The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government. . . . The holding of meetings for peaceable political action cannot be proscribed. Those who assist in the conduct of such meetings cannot be branded as

criminals on that score. The question, if the rights of free speech and peaceable assembly are to be preserved, is not as to the auspices under which the meeting is held but as to its purpose; not as to the relations of the speakers, but whether their utterances transcend the bounds of the freedom of speech which the Constitution protects. If the persons assembling have committed crimes elsewhere, if they have formed or are engaged in a conspiracy against the public peace and order, they may be prosecuted for their conspiracy or other violation of valid laws. But it is a different matter when the State, instead of prosecuting them for such offenses, seizes upon mere participation in a peaceable assembly and a lawful public discussion as the basis for a criminal charge. We are not called upon to review the findings of the state court as to the objectives of the Communist Party. Notwithstanding those objectives, the defendant still enjoyed his personal right of free speech and to take part in a peaceable assembly having a lawful purpose, although called by that party." (299 U.S. 353, 363-366; see, also, *Near* v. *Minnesota, supra,* 283 U.S. 697, 716; *Herndon* v. *Lowry,* 301 U.S. 242 [57 S.Ct. 732, 81 L.Ed. 1066]; *Stromberg* v. *California,* 283 U.S. 359, 369 [51 S.Ct. 532, 75 L.Ed. 1117].)

The De Jonge case cannot be distinguished on the ground that it involved a criminal statute, while the statute in the present case sought to suppress free speech and free assembly by requiring an administrative board to deny permits for meetings of those whose objects and affiliations are disapproved. In each case the state sought to suppress free speech and assembly and it is immaterial that it sought to accomplish that objective in the one case by threat of punishment and in the other by censorship. (See *Near* v. *Minnesota,* 283 U.S. 697, 715 [51 S.Ct. 625, 75 L.Ed. 1357]; *Thornhill* v. *Alabama,* 310 U.S. 88, 97 [60 S.Ct. 736, 84 L.Ed. 1093]; *Hague* v. *CIO,* 307 U.S. 496, 516 [59 S.Ct. 954, 83 L.Ed. 1423].)

The privilege of using a school building as a public forum is one too valuable to be given lightly or lightly taken away. It is also too valuable lightly to be received. It can be lost to the whole community if some persons or groups abuse it frivolously, maliciously, or dangerously. The state must be on the alert for any clear and present danger to the community, sensitive to the warning signals, the ambiance in which a forum is planned, the atmosphere that envelops it.

It cannot look with equanimity upon those whose words or actions have already left in their wake a trail of violence.

Always it must distinguish, however, between speech, no matter how unorthodox, that remains on a theoretical plane, and speech, no matter how skillfully intoned, that creates a clear and present danger to the community. "There is a material difference between agitation and exhortation calling for present violent action which creates a clear and present danger of public disorder or other substantive evil, and mere doctrinal justification or prediction of the use of force under hypothetical conditions at some indefinite future time— prediction that is not calculated or intended to be presently acted upon, thus leaving opportunity for general discussion and the calm processes of thought and reason. *Cf. Bridges* v. *California,* 314 U.S. 252 [62 S.Ct. 190, 86 L.Ed. 192], (1941), and Justice Brandeis' concurring opinion, *Whitney* v. *California,* 274 U.S. 357, 372-380 [47 S.Ct. 641, 71 L.Ed. 1095]; see, also, *Taylor* v. *Mississippi,* 319 U.S. 583 [63 S.Ct. 1200, 87 L.Ed. 1600] (1942)." (*Schneiderman* v. *United States,* 320 U.S. 118, 157 [63 S.Ct. 1333, 87 L.Ed. 1796].)

There is no sign that any danger would arise from the proposed meetings in the present case. The "Bill of Rights in Postwar America" is not only a legitimate subject of discussion but one of great public interest. The proposed speakers include men well qualified to discuss the subject and there is no likelihood that any substantive evil would arise out of their discussion. The proponents of the meetings, officers of the San Diego Civil Liberties Committee affiliated with the American Civil Liberties Union, have made it clear that they refuse to comply with the requirement of respondent board that they file affidavits as to their convictions and affiliations because that requirement violates their constitutional rights of free speech and free assembly. They take their stand on a constitutional principle that does not commit them to approval of those who believe in the overthrow of government by violence. It may seem ironic that others who hold such beliefs may seek from the state the privilege of a public forum. But when the principles of free speech and peaceable assembly are at stake, the state has more to gain than to lose by a generous tolerance of the convictions and affiliations of its many citizens so long as they present no clear and present danger to the community.

The unconstitutionality of section 19432 does not in-

validate the rest of the Civic Center Act, contained in sections 19431 and 19433-19439 of the Education Code. ▮ "It is a general rule supported by an unbroken line of decisions that a provision in or a part of an act may be unconstitutional and beyond the power of the legislature to enact, and still the whole act may not be void. The accepted doctrine in such case is that the constitutional portions of the statute may stand alone and remain in force if they can be separated from the portions which are void. The unconstitutional provisions will not vitiate the whole act, unless they enter so entirely into the scope and design of the law, that it would be impossible to maintain it without such obnoxious provisions." (*People* v. *Lewis*, 13 Cal.2d 280, 284 [89 P.2d 388]; see 5 Cal.Jur. 643, 644.) ▮ The Civic Center Act can be upheld and enforced without the unconstitutional provision. The Civic Center Act was first enacted in 1913 (Stats. 1913, p. 853); in 1929 it was incorporated into the School Code (Sch. Code, 1929, §§ 6.750-6.772). Neither in its original form nor as enacted into the School Code did it contain any provision similar to section 19432. It was not until 1935, when public meetings in school buildings had become a time-honored institution that the act was amended by adding a provision making the use of the school buildings for public meetings dependent on a determination that the users are not subversive in the sense specified in section 19432. (Stats. 1935, p. 1460.) ▮ When an act that has stood valid over the years is amended by an unconstitutional provision, ordinarily the amendment alone is invalid. (*Miller* v. *Union Bank & Trust Co.*, 7 Cal.2d 31, 36 [59 P.2d 1024]; *Frost* v. *Corporation Commission*, 278 U.S. 515, 525, 526 [49 S.Ct. 235, 73 L.Ed. 483].) ▮ Any doubt as to the validity of the rest of the Civic Center Act is dispelled by the fact that as part of the Education Code it is governed by the general rules of construction contained in the preliminary provisions thereof. (Govt. Code, § 9603.) Section 26 of the Education Code provides: "If any provision of this code, or the application thereof to any person or circumstances is held invalid, the remainder of the code and the application of such provision to other persons or circumstances shall not be affected thereby." ▮ Although such language cannot be read as an inexorable command it is well settled that "The use of such language may rightly be considered by the court as a declaration of intention on the part of the legislature that in so far as lay within its power

a separable invalid portion of the act should not destroy the whole.'' (*Bacon Service Corp.* v. *Huss,* 199 Cal. 21, 32, 33, 34 [248 P. 235]; *In re Portnoy,* 21 Cal.2d 237, 242 [131 P.2d 1]; *People* v. *Perry,* 212 Cal. 186, 195 [298 P. 19, 76 A.L.R. 1331]; *Crowell* v. *Benson,* 285 U.S. 22, 63 [52 S.Ct. 285, 76 L.Ed. 598]; see 11 Am.Jur. 846.)

Let the peremptory writ issue forthwith.

Gibson, C. J., Edmonds, J., and Schauer, J., concurred.

CARTER, J., Concurring.—In my opinion the writ should issue, and I agree with the views expressed in the opinion prepared by Mr. Justice Traynor in this case with the exception of what is said therein relative to the holding in the majority opinion in *Payroll Guaranty Assn.* v. *Board of Education,* 27 Cal.2d 197 [163 P.2d 433, 161 A.L.R. 1300]. I adhere to the views expressed in my dissenting opinion in the last mentioned case, and for that reason, cannot concur unqualifiedly in the opinion prepared by Mr. Justice Traynor in the case at bar.

As I see the question presented here, it is whether or not the Legislature may authorize the use of school property as a civic center and at the same time place it within the power of the governing school board to deny permission for the use of said property to persons who may be affiliated with organizations which the Legislature has declared to constitute a subversive element. The effect of such legislation is to permit a prior censorship on the right of assembly and expression. In my opinion this cannot be done without violating the provisions of the First and Fourteenth Amendments to the Constitution of the United States. The First Amendment unqualifiedly guarantees freedom of speech and freedom of assembly. No restriction on the exercise of these rights is mentioned in the Constitution or the amendments thereto. The restrictions which have been placed upon these rights are found in the judicial decisions interpreting the provisions above mentioned. In *Schenck* v. *United States,* 249 U.S. 47, at page 52 [39 S.Ct. 247, 63 L.Ed. 470], Mr. Justice Holmes said: ''The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force. *Gompers* v. *Buck's Stove & Range Co.,* 221

U.S. 418, 439 [31 S.Ct. 492, 55 L.Ed. 797]. The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree." The clear and present danger rule has been followed and applied by the Supreme Court of the United States in numerous decisions in the interpretation of statutes designed to proscribe the rights of freedom of speech and of assembly under varying circumstances and conditions. The trend of these decisions as disclosed by the citations thereof in the opinion prepared by Mr. Justice Traynor in this case is toward a more liberal application of the provisions of the First and Fourteenth Amendments of the Constitution of the United States to the end that freedom of speech and of assembly may not be denied to persons because of their affiliation with organizations declared by a state to constitute a subversive element. This thought was clearly expressed by Chief Justice Hughes in *De Jonge* v. *Oregon,* 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278], where he said: "We are not called upon to review the findings of the state court as to the objectives of the Communist Party. Notwithstanding those objectives, the defendant still enjoyed his personal right of free speech and to take part in a peaceable assembly having a lawful purpose, although called by that party."

I can see no escape from the proposition that if membership in or affiliation with an organization declared to constitute a subversive element does not deprive one of his right to freedom of speech or of assembly, it is then beyond the power of the Legislature to authorize restrictions against the use of school property which will prevent such persons from using such property in the same manner as other members of the public may be permitted to use the same in the exercise of their rights of speech and assembly.

SPENCE, J.—I dissent. The respondent board has granted to petitioners permission to use a school auditorium, subject only to the condition that they subscribe to and file with the board affidavits containing the following declaration: "I do not advocate and I am not affiliated with any organization which advocates or has as its object or one of its objects the overthrow of the present Government of the United States or of any State by force or violence, or other unlawful means."

Petitioners refuse to file such affidavits and they seek a writ of mandate to compel the respondent board to grant such permission unconditionally, claiming that the condition imposed is violative of their constitutional rights.

Section 19432 of the Education Code, as amended in 1945 (Stats. 1945, chap. 1213), is set forth in the majority opinion and need not be repeated here.

It is but one section of the Civic Center Act, which was reframed and reenacted in 1943 (Stats. 1943, pp. 690-692, Ed. Code, §§ 19431-19439), which act constituted a grant of power to the governing boards of school districts to permit the use of school buildings, subject to the limitation or exception contained in section 19432. It is conceded in the majority opinion that "If the section is valid, it is clear that the board acted reasonably when it provided for affidavits in its rules in conformity with the legislative amendment." The conclusion reached in the majority opinion is that the provisions of section 19432 are unconstitutional and void, that petitioners may not be required to file the affidavits, and that petitioners are therefore entitled to the issuance of the writ. With these conclusions I cannot agree.

While the Supreme Court of the United States has jealously guarded civil liberties, there is no decision of that court or of any other court which compels the conclusion that the provisions of section 19432 of the Education Code are unconstitutional and void. Here the question presented is not whether particular acts or utterances may be punished under a criminal statute without infringing upon the provisions of the First or Fourteenth Amendment of the Constitution of the United States; or whether a public official may be granted arbitrary power to grant or deny a permit to persons who desire to assemble and speak in a public place which is open generally to members of the public at all times. We have here the simple question of whether the Legislature may provide that those who seek permission to use as meeting places our public schools, which are erected and maintained by our government primarily for educational purposes and are not open generally to the public at all times or for all purposes, may be required to take an oath, as a condition to the enjoyment of such use, that they do not advocate and are not affiliated with any organization which advocates the overthrow of that government by force or violence or other unlawful means. Section 19432 authorizes the respondent board to require such

oath and in my opinion it authorizes nothing which is unreasonable or which violates any of the constitutional rights of those who seek permission for such use. It is worthy of note that only a few months ago this court assumed the constitutionality of the same provisions of section 19432 of the Education Code which are now challenged, when it said in *Payroll Guaranty Assn.* v. *Board of Education,* 27 Cal.2d 197 [163 P.2d 433, 161 A.L.R. 1300], at page 200: "The respondent board may not only make reasonable regulations with regard to the use of the school auditorium for authorized purposes but may deny an application for its use if (1) such use would further, directly or indirectly, the overthrow of the present government of the United States or any State, Territory or Possession thereof, by force or violence or other unlawful means, . . . ."

Reference has been made in the briefs and in the majority opinion to the so-called "clear and present danger" rule. While that rule finds expression in certain majority opinions in the decisions of the United States Supreme Court, as well as in certain concurring and dissenting opinions, it has yet to be defined in such manner as to permit any degree of certainty in its application. In the concurring opinion of Mr. Justice Brandeis in *Whitney* v. *California,* 274 U.S. 357, 374 [47 S.Ct. 641, 71 L.Ed. 1095], he said: "This court has not yet fixed the standard by which to determine when a danger shall be deemed clear; how remote the danger may be and yet be deemed present." In the majority opinion in a very recent decision of the United States Supreme Court, handed down on June 3, 1946, (*Pennekamp* v. *Florida,* —— U.S. —— [66 S.Ct. 1029, 90 L.Ed. ——], October Term, 1945), it is frankly said: "No definition could give an answer" and that the rule still has the "vice of uncertainty." In any event, no decision of the United States Supreme Court has been called to our attention in which the "clear and present danger" rule has been applied to a situation similar to that presented here, and in my opinion it has no application.

It seems clear that our goverment is not required to maintain its public buildings for the use as meeting places of those who advocate its overthrow by force and violence. I believe that the limitation or exception found in the statute might have been made broader, if the Legislature had seen fit, and that the Legislature might have withheld power from the governing boards of school districts to permit the use of

the school buildings by those who advocate other serious crimes. There could be no valid constitutional objection to a limitation or exception denying the use of our school buildings to those who advocate lynching or who advocate the assassination of the President of the United States or who advocate other crimes of violence against persons; and for similar reasons, there can be no valid objection to denying the use of such buildings to those who advocate the overthrow of the government by force and violence. It is impossible to divorce crime from its criminal aspects even though it may be committed for a purpose having a political tinge; and the advocacy of crime does not become sacrosanct merely because of the nature of the motives or purposes of its advocates. When those advocating the overthrow of our government by force and violence seek the use of our school buildings as meeting places, consideration of the safety of our educational facilities would appear to be alone sufficient to justify the denial of such use; and the question of whether there may be said to be a "clear and present danger" of the overthrow of our government by force and violence would appear to be immaterial.

But if such considerations be deemed insufficient to render immaterial the question of "clear and present danger," there are nevertheless no definite indications in the decisions of the United States Supreme Court that the provisions of section 19432 of the Education Code should be declared unconstitutional. On the contrary, the wording of that section bears similarity to the wording of the Criminal Syndicalism Act (Stats. 1919, p. 281), and that act has been held to be constitutional in unanimous decisions of the United States Supreme Court and of this court. (*Whitney* v. *California*, 274 U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095]; *People* v. *Steelik*, 187 Cal. 361 [203 P. 78].) That act, unlike the act before us, was a penal statute. The "clear and present danger" rule was discussed in the concurring opinion in the Whitney case but the conviction under the act was unanimously sustained. *De Jonge* v. *Oregon*, 299 U.S. 353 [57 S.Ct. 255, 81 L.Ed. 278] is adequately discussed in *People* v. *Chambers*, 22 Cal.App.2d 687 at p. 699 [72 P.2d 746]. The De Jonge case likewise involved a penal statute and while the court reversed the conviction upon the ground that the "Oregon statute as applied to the particular charge as defined by the state court is repugnant to the due process clause of the Fourteenth

Amendment," it cited with approval both *Whitney* v. *California, supra,* and *Gitlow* v. *New York,* 268 U.S. 652 [45 S. Ct. 625, 69 L.Ed. 1138].

In the last mentioned case the United States Supreme Court said at page 669: "That utterances inciting to the overthrow of organized government by unlawful means, present a sufficient danger of substantive evil to bring their punishment within the range of legislative discretion, is clear. Such utterances, by their very nature, involve danger to the public peace and to the security of the State. They threaten breaches of the peace and ultimate revolution. And the immediate danger is none the less real and substantial, because the effect of a given utterance cannot be accurately foreseen. The State cannot reasonably be required to measure the danger from every such utterance in the nice balance of a jeweler's scale. A single revolutionary spark may kindle a fire that, smouldering for a time, may burst into a sweeping and destructive conflagration. It cannot be said that the State is acting arbitrarily or unreasonably when in the exercise of its judgment as to the measures necessary to protect the public peace and safety, it seeks to extinguish the spark without waiting until it has enkindled the flame or blazed into the conflagration. It cannot reasonably be required to defer the adoption of measures for its own peace and safety until the revolutionary utterances lead to actual disturbances of the public peace or imminent and immediate danger of its own destruction; but it may, in the exercise of its judgment, suppress the threatened danger in its incipiency."

This court has said: "The right of free speech does not include the right to advocate the destruction or overthrow of government or the criminal destruction of property" (*People* v. *Steelik,* 187 Cal. 361, 375 [203 P. 78]); and the United States Supreme Court has said: "The Constitution was adopted to preserve our Government, not to serve as a protecting screen for those who while claiming its privileges seek to destroy it." (*United States ex rel. Milwaukee Social Democratic Pub. Co.* v. *Burleson,* 255 U.S. 407, 414 [41 S.Ct. 352, 65 L.Ed. 704].)

In *Whitney* v. *California,* 274 U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095], the United States Supreme Court stated at page 371: "Nor is the Syndicalism Act as applied in this case repugnant to the due process clause as a restraint of the rights of free speech, assembly, and association.

"That the freedom of speech which is secured by the Constitution does not confer an absolute right to speak, without responsibility, whatever one may choose, or an unrestricted and unbridled license giving immunity for every possible use of language and preventing the punishment of those who abuse this freedom; and that a state in the exercise of its police power may punish those who abuse this freedom by utterances inimical to the public welfare, tending to incite to crime, disturb the public peace, or endanger the foundations of organized government and threaten its overthrow by unlawful means, is not open to question. *Gitlow* v. *New York,* 268 U.S. 652, 666-668, 69 L.Ed. 1138, 1145, 1146, 45 S.Ct. 625, and cases cited.

"By enacting the provisions of the Syndicalism Act the State has declared, through its legislative body, that to knowingly be or become a member of or assist in organizing an association to advocate, teach or aid and abet the commission of crimes or unlawful acts of force, violence or terrorism as a means of accomplishing industrial or political changes, involves such danger to the public peace and the security of the state, that these acts should be penalized in the exercise of its police power. That determination must be given great weight. Every presumption is to be indulged in favor of the validity of the statute (*Mugler* v. *Kansas,* 123 U.S. 623, 661, 31 L.Ed. 205, 210, 8 S.Ct. 273), and it may not be declared unconstitutional unless it is an arbitrary or unreasonable attempt to exercise the authority vested in the state in the public interest (*Great Northern R. Co.* v. *Clara City,* 246 U.S. 434, 439, 62 L.Ed. 817, 819, 38 S.Ct. 346).

". . . We cannot hold that, as here applied, the act is an unreasonable or arbitrary exercise of the police power of the state, unwarrantably infringing any right of free speech, assembly or association, . . ."

And in considering the validity of our election statute, this court said in *Communist Party* v. *Peek,* 20 Cal.2d 536, 551 [127 P.2d 889] : "There is no doubt, however, that the remainder of section 2540.4 comes within the Legislature's power to prescribe tests and conditions for participation in primary elections. This power certainly includes the right to adopt tests designed to exclude those political parties advocating the overthrow of the government by unlawful means or those parties carrying on a program of sabotage, force and violence, sedition or treason. Such groups constitute an immediate

threat to the functioning of our institutions, including the continued exercise of the right of suffrage. Since it is within the power of the state as to such groups to restrict even the rights of free speech and free press (see, for example, *Whitney* v. *California,* 274 U.S. 357 [47 S.Ct. 641, 71 L.Ed. 1095]; *Stromberg* v. *California,* 283 U.S. 359 [51 S.Ct. 532, 75 L.Ed. 1117]; *De Jonge* v. *Oregon,* 299 U.S. 353, 364 [57 S.Ct. 255, 81 L.Ed. 278]), it clearly was within the reasonable bounds of the Legislature's power to determine that these bodies should also be barred from the primary election ballot. Under such circumstances we have no doubt that the Legislature's power to exclude parties and individuals from participation in a primary election extends to those groups whose political beliefs create a clear danger to the continued existence of the institutions under which our constitutional form of government functions.''

In the obscurity of the definition and application of the ''clear and present danger'' rule, it has been suggested that there may be some doubt as to whether the Supreme Court of the United States would still adhere to the views expressed in the Gitlow case, *supra,* in the consideration of a similar conviction under a penal statute. I am of the opinion that it would but I believe there is no doubt that it would still adhere to those views in upholding the right of any state to adopt reasonable provisions, such as those embodied in section 19432 of the Education Code, seeking to prevent the use of its school buildings as meeting places by those whose avowed purpose is the overthrow of our government by force and violence or by those who are unwilling to disclaim such purpose. Until the United States Supreme Court may have definitely repudiated those views, I believe this court should uphold the reasonable and salutary provisions of that section.

It might be stated that some application of the ''clear and present danger'' test since the Gitlow case, *supra,* has been in cases such as habeas corpus proceedings arising after commitments for contempt, in which there has been no legislative evaluation of the particular type of utterance or its consequences. Thus, it was said in *Bridges* v. *California,* 314 U.S. 252, at page 261 [62 S.Ct. 190, 86 L.Ed. 192]: ''The judgments below, therefore, do not come to us encased in the armor wrought by prior legislative deliberation.'' It has always been recognized that where the Legislature has appraised a particular kind of situation and found a specific

danger sufficiently imminent to justify a restriction on a particular kind of utterance, such determination should be given great weight when the law is challenged on constitutional grounds. (See *Herndon* v. *Lowry,* 301 U.S. 242, 258 [57 S.Ct. 732, 81 L.Ed. 1066] ; *Cantwell* v. *Connecticut,* 310 U.S. 296, 307 [60 S.Ct. 900, 84 L.Ed. 1213, 128 A.L.R. 1352] ; *Graves* v. *Minnesota,* 272 U.S. 425, 428 [47 S.Ct. 122, 71 L.Ed. 331] ; *Bridges* v. *California,* 314 U.S. 252, 260 [62 S.Ct. 190, 86 L.Ed. 192].) Here the Legislature has appraised the situation and has made its determination, which determination should be accorded great weight and should not be set aside by this court unless it clearly appears that it was without any foundation.

While I do not believe that further reasons for sustaining the constitutionality of section 19432 of the Education Code are necessary, one further consideration should be mentioned. The reenactment of the Civic Center Act in 1943 and the amendment to section 19432 in 1945, together with the facts giving rise to its application here, all occurred during a time of emergency when a state of war, as declared by Congress, existed between our government and certain foreign powers. During such periods of national emergency the imperative need for united effort to sustain our government and for all reasonable measures to prevent attempts at its overthrow, from without or within, seems obvious. Regardless of any divergent views concerning the "clear and present danger" rule, it should be clear that it is not for the courts, in such times of emergency, to declare that no "clear and present danger" exists when Congress, by its declaration of a state of war, has declared otherwise, and the Legislature has enacted legislation which tends to minimize that danger.

In passing, it should be stated that no question concerning the validity of other rules of the respondent board is involved. It should be further stated that the claims of petitioners—that they are known to be law-abiding citizens and that their organization is known as an important civic organization with useful purposes—are entirely beside the point. The sole question is whether all persons seeking permission to use the school buildings may be required to file affidavits in the form above set forth.

If it should be assumed, however, that the majority opinion is correct in concluding that the provisions of section 19432 are unconstitutional and void, the petitioners are neverthe-

less not entitled to the issuance of the writ. The Civic Center Act, as enacted in 1943 (Ed. Code, §§ 19431 to 19439), was based upon former sections of the School Code, including section 6.750 of the latter code, which last mentioned section had long embraced the limitation or exception now contained in the first paragraph of section 19432 of the Education Code. That limitation denies to the governing boards of school districts the power to grant the use of school buildings to those who advocate the overthrow of our government by force and violence. The amendment made in 1945 to section 19432 (Stats. 1945, chap. 1213, p. 2301) specifically authorized the governing boards of school districts to require the above mentioned affidavits as an aid in determining the facts.

According to the majority opinion, the limitation and 1945 amendment are void but the remainder of the act stands. This can be so only if it clearly appears that the Legislature intended the part remaining to be enforceable even though the other part should fail (*Bacon Service Corp.* v. *Huss,* 199 Cal. 21, 32 [248 P. 235]; *In re Portnoy,* 21 Cal.2d 237, 242 [131 P.2d 1]; *Robison* v. *Payne,* 20 Cal.App.2d 103, 107 [66 P.2d 710]; 5 Cal.Jur. § 73, p. 648). The so-called severability clause (Ed. Code, § 26) referred to in the majority opinion is not determinative as to all possible contingencies arising out of invalidation of provisions of the code (see *Bacon Service Corp.* v. *Huss,* 199 Cal. 21, 34 [248 P. 235]; *In re White,* 195 Cal. 516, 521 [234 P. 396]; *In re Portnoy,* 21 Cal. 2d 237, 242 [131 P.2d 1]), and placed as it is among the general provisions prefixing the entire Education Code, can be of little aid when we come to the real problem of discerning the precise intent of the Legislature with reference to the Civic Center Act. It is to be remembered that this act was last enacted in a time of war and during an emergency that has not yet been declared over. Factors of safety and domestic security have already been alluded to, and whatever may have been the attitude of the legislators at any time prior to such enactment, there is no question but that such factors were paramount in their minds at that time. There is nothing in the Civic Center Act to support the conclusion that the Legislature would have enacted the act without the limitation which it includes. It follows that if the limitation is invalid, the entire grant of power to the governing boards of school districts is invalid, in which event there is neither duty nor right upon the part of the respondent board to grant the use of the school building to petitioners.

This view finds support in *Pasadena City High School Dist.* v. *Upjohn*, 206 Cal. 775 [276 P. 341, 63 A.L.R. 408]. The court there considered section 1741 of the Political Code which provided: "The high school board of any high school district may provide, in such manner as they deem best, for the transportation to and from the high school of such pupils thereof, *except pupils living within the limits of any city*, as such board find to be in need of such transportation; and the cost of the transportation shall be deemed a part of the cost of maintaining the high school and paid accordingly." (Emphasis added.)

The constitutionality of the emphasized exception, which had been added by amendment, was there challenged. This court said at page 779: "Assuming for the moment that the entire exception be void, *its invalidity would destroy the whole grant of power*, for there is no indication that the legislature would have enacted the amended section without including the exception. (See *Bacon Service Corp.* v. *Huss*, 199 Cal. 21 [248 P. 235]; *Mordecai* v. *Board of Supervisors*, 183 Cal. 434 [192 P. 40].) On the contrary, the character of the legislation plainly indicates that it was not the intention of the legislature to permit free transportation to be afforded to all high school pupils regardless of the proximity of their homes to the high school if the exception should be held invalid." (See, also, 5 Cal.Jur. § 71, p. 645; 11 Am.Jur. § 155, p. 842; Lewis' Sutherland Stat. Const. (2d ed.), vol. 1, § 306.)

Here, as in the Pasadena High School case, the entire act constituted a grant of power, subject to a limitation or exception, and only the limitation or exception was challenged on constitutional grounds. To paraphrase the language of the Pasadena High School case in its relation to the case at hand: "The character of the legislation plainly indicates that it was not the intention of the legislature to permit the use of school buildings to be afforded to all persons, regardless of their advocacy of the overthrow of our government by force and violence, if the exception should be held invalid."

For the foregoing reasons, I conclude first, that the provisions of section 19432 are constitutional, and second, that even if it be assumed that those provisions are unconstitutional, petitioners are not entitled to the relief demanded.

In my opinion, the alternative writ should be discharged and the peremptory writ should be denied.

Shenk, J., concurred.